ISAAC NEWTON, CLAIMANT OF STEAMBOAT NEW JERSEY, APPELLANT, *v.* JOHN H. STEBBINS.

Where a sailing vessel was descending the Hudson River with but a trifling wind, and chiefly by the force of the current, and came into collision with a steamer ascending the river, the question in the case was, whether or not the accident happened, notwithstanding every proper precautionary measure had been taken on the part of the steamboat to pass the sloop in safety, in consequence of an improper movement of that vessel by the mismanagement and unskilfulness of the persons in charge of her. If the sailing vessel kept her course, it was the duty of the steamboat to avoid her. The evidence showing that the steamer did not take

proper precautionary measures to avoid the sloop while endeavoring to pass her, the responsibility of the collision must rest upon the steamer.

The steamer was in fault for not slackening her speed, on meeting a fleet of sailing vessels in a narrow channel of the river, she then going at the rate of from eight to ten knots the hour. She was also in fault, in not having a proper look-out at the forward part of the vessel, there being no one but the man at the wheel on deck.

THIS was an appeal from the Circuit Court of the United States for the Southern District of New York.

Like the preceding case, it arose from a collision which took place between a steamboat and a sailing vessel.

The circumstances under which the collision took place, as claimed to exist by the respective parties, are thus set forth in the libel and answer. The libel was filed in November, 1845.

" To the Honorable Samuel R. Betts, Judge of the District Court of the United States for the Southern District of New York.

" The libel and complaint of John H. Stebbins, of Coeymans, mariner, owner of the sloop Hamlet, whereof the libellant was master, her tackle, apparel, and furniture, against the steamboat New Jersey, whereof one Beebe now is or late was master, her engine, boiler, tackle, apparel, and furniture, now within this district, and also against all persons lawfully intervening for their interest therein, in a cause of collision, civil and maritime; and thereupon the said John H. Stebbins alleges and articulately propounds as follows : —

" 1st. That some time in the month of October last the said sloop Hamlet (whereof the said libellant was master) was at the port of Bristol on the Hudson River, and destined on a voyage thence to the port of New York, with a cargo of flagging and other stone on board; and was at the time a tight, stanch, and well-built vessel, of the burden of ninety tons, or thereabouts, and was then completely rigged and sufficiently provided, and then had on board, and in her service, a full and competent crew for the navigation of said sloop on the voyage above mentioned.

" 2d. That in the said month of October the said sloop, provided and manned as aforesaid, sailed from the port of Bristol on her aforesaid voyage to the port of New York, and in the prosecution of the said voyage, as he is informed and believes, the said sloop proceeded at the rate of about four or five miles per hour, until she arrived at a point on the Hudson River called Blue Point; that at that point the wind failed, and the said sloop then proceeded with the force of the current and very little wind about one or two miles an hour; that on her arrival at said point, and while the said vessel was within the juris-

diction of this court, the person in charge of the said sloop observed the said steamboat coming up the river at the rate of about twelve or fifteen miles per hour, and nearer to the east shore of said river than the said sloop, and directed the man at the helm to head the said sloop more to the west shore of said river, which was done; that when said steamboat New Jersey arrived within a short distance of the said sloop, she altered her course to the westward, and negligently and carelessly headed across the bows of said vessel, and attempted to pass to the westward of said sloop; in consequence of which negligent conduct of those in charge of said steamboat, the said steamboat struck the end of the said sloop's bowsprit, carrying away about ten or twelve feet of the said bowsprit and the stays attached thereto, forcing the bows of the said sloop round so that she struck the sloop on the larboard bow, doing such injury to the said sloop by said collision, that the sloop immediately sunk, with her said cargo.

" 3d. That at the time the damage mentioned in the preceding article happened, it was impossible for the said sloop Hamlet to get out of the way of the said steamboat New Jersey, the said sloop having little comparative way on, and being at the time to the westward, and out of the course of the said steamboat, and there being room enough for the said steamboat to have passed to the eastward of said sloop, as she might and ought to have done. That if the persons having charge of the said steamboat New Jersey had taken proper precaution to keep clear of the said sloop, which it was their duty to have done, the damage in the next preceding article set forth would not have happened.

" 4th. That the said sloop, at the time of the receiving of the damage above mentioned, was a tight, stanch, and strong vessel, and that the libellant then was, and now is, the true and lawful owner of said sloop, her tackle, apparel, and furniture.

" 5th. That by the collision aforesaid, and the consequent sinking of said sloop, with her cargo, the libellant has sustained damage to the amount of three thousand five hundred dollars.

" 6th. That all and singular the premises are true, and within the admiralty and maritime jurisdiction of the United States and of this honorable court; in verification whereof, if denied, the libellant prays leave to refer to pleadings and other proofs to be by him exhibited in this cause.

" Wherefore, the libellant prays, that process in due form of law, according to the course of courts of admiralty, and of this honorable court in cases of admiralty and maritime jurisdiction, may issue against the said steamboat New Jersey, her

engine, boilers, tackle, apparel, and furniture, wheresoever the same may be found; and that all persons having, or pretending to have, any right, title, or interest therein may be cited to appear and answer all and singular the matters so articulately propounded; and that this honorable court would be pleased to pronounce for the damages aforesaid, or for such other and different relief to the libellant in the premises as shall to law and justice appertain, and also to condemn the said steamboat, her engine, tackle, apparel, and furniture, and the persons intervening for their interest therein, in costs.

" JOHN H. STEBBINS."

To this libel, Isaac Newton filed the following answer.

"January Term, 1846.

" To the Honorable Samuel R. Betts, Judge of the District Court of the United States within and for the Southern District of New York:

" And now Isaac Newton, intervening for his interest in the steamboat New Jersey, appears before this honorable court, and for answer to the libel and complaint of John H. Stebbins against the said steamboat New Jersey, her engine, boilers, tackle, apparel, and furniture, and against all persons lawfully intervening for their interest therein, alleges and articulately propounds as follows : —

" 1st. That this respondent was the owner of said steamboat, her boiler, engine, &c., in October last, at the time of the alleged collision of said sloop Hamlet, in the libel mentioned, and the New Jersey, and before that time, and afterwards until the sale of said steamboat to William B. Dodge and John S. Moore, on or about the 19th day of November last; and that since such sale by this respondent to said Dodge and Moore, this respondent has been and still is bound to indemnify and save the said Dodge and Moore harmless against any claim or demand which the said libellant, or any other person, may have against said steamboat, her boiler, engine, &c., by reason of any such collision, and has been ever since such sale, and still is, interested in said steamboat, her engine, tackle, apparel, and furniture, as mortgagee for the purchase money.

" 2d. This respondent also admits that the libellant was the master of the said sloop Hamlet; but he says, on information and belief, that said libellant was not in command on board said sloop at the time of the collision in question, nor at any time during her said trip or voyage. This respondent also admits that said sloop was at Bristol, on the Hudson, as alleged in the first article of said libel, and destined on a trip or voyage

thence to New York, with a cargo of some sort on board, but he is not informed, save from the libel, and therefore will leave the said libellant to prove, of what her cargo consisted; and this respondent denies, on information and belief, that said sloop was, as alleged in said libel, tight, stanch, and well built; and he also denies, on information and belief, that said sloop was completely rigged and sufficiently provided; and especially does he deny that she had on board, and in her service, a full and complete crew for the navigation of said sloop on her destined voyage; and he avers, as he is informed and believes, that she was not sufficiently manned, that the master was not on board of her, and no competent person in charge of said sloop on said voyage.

" 3d. This respondent further says, that, as he is informed and believes, on the afternoon previous to the collision in question, the New Jersey started from New York at or about five o'clock, with a tow-boat of about two hundred tons burden, bound for Hudson, and at the time of said collision, which arose from running the sloop into the said steamboat, as hereinafter mentioned, the said steamboat was within about half a mile from a point on the Hudson known as Blue Point, a distance of about eighty miles from New York ; that the time of the collision in question was about two o'clock in the morning; that at the time of collision, and a short time previous to the collision, and for three or four miles before the sloop struck the steamboat, the steamboat was on the west side of the river, and westward of the course of the sloop, with her tow-boat on her west side ; that said steamboat had had a fair tide until a little before the collision happened, but at the time of the collision it was slack water; that a short time previous to the collision, and that at the time thereof, the wind was from the westward and blowing a stiff breeze ; that the steamer, a short time previous to the collision, was slowed, and was stopped about the time of the collision ; that the steamboat did not cross the bow of the sloop, nor the course the sloop was running at the time the sloop came in sight, and that the collision arose from the short luffing of the sloop, through the fault and wilfulness, carelessness, mismanagement, or misdirection of the person or persons in charge of the sloop, which the persons in charge of the steamboat could not have foreseen nor guarded against, whereby the said sloop was run into the said steamboat by the person in charge of said sloop, and with so much force and violence as to drive the bowsprit of the sloop into the steamboat, and do a great damage to said steamboat; or that the said collision arose otherwise from the fault, mismanagement, misdirection, or incompetency of the person or persons

in charge of the said sloop, and that the said collision happened without any fault, misdirection, or mismanagement of the persons in charge of said steamboat. And this respondent further answering says, that he is not informed of the rate at which the said sloop was proceeding before and after their arrival off Blue Point, but he has reason to believe, and does believe, that the said sloop was proceeding much more rapidly through the water, both before and after their arrival off Blue Point, than as aforesaid is stated in said libel; and he denies, on information and belief, that the wind failed as said sloop arrived at the point. And this respondent denies, on information and belief, that the said steamboat, with her tow-boat, at the time she came in sight of the sloop, or at any time on her said trip or voyage from New York, either did or could have proceeded at the rate of near twelve or fifteen miles per hour, but she was moving at a much slower rate, and very slow; and he likewise denies, as he is informed and believes, that said steamboat was at any time after her coming in sight of said sloop nearer to the east shore of said river than said sloop; but whether or not the person or any persons having charge of said sloop directed the man at the helm thereof to head the sloop more to the west shore of said river, and whether the same was done in manner and form as alleged in said libel, this respondent is ignorant, and would leave said libellant to prove the same; but he is informed and believes that as said steamboat, going up the river, was passing said sloop to the west of said sloop, and said sloop, going down the river, was passing to the east of said steamboat, the course of said sloop was suddenly altered through the manifest fault and carelessness, mismanagement, or misdirection of the persons in charge of said sloop, and so directed to the westward as to run her into said steamboat; and this respondent further says, as he is informed and believes, that as the said steamboat was passing said sloop to the westward, with her tow-boat in tow on her west side as aforesaid, the said sloop being headed toward the eastward, before the sudden change of direction of said sloop as aforesaid, he is informed and believes that said steamboat was directed farther, and as far as possible, to the westward to keep clear of said sloop, and that she was not directed westward so as to cross the bow of said sloop; and that the said steamboat was not negligently or carelessly, or otherwise, headed across the bows of said vessel, nor was it attempted to pass said steamboat to the westward across the bow of the sloop, or the course of the sloop; and this respondent denies, on information and belief, that it was in consequence of any negligent conduct or fault of those in charge of said steamboat that said steamboat struck

the end. of said sloop's bowsprit, and says, as he is informed and believes, that the allegation is more correct, as it is in accordance with the fact, to say, that the end of the bowsprit of the sloop struck the steamboat, than that the steamboat struck the end of the bowsprit of the sloop, which is not true, as this respondent is informed and believes. And this respondent admits that said sloop sunk at or soon after the collision ; but he says, as he is informed and believes, it was through the weakness and insufficiency of the said sloop, and through the carelessness and mismanagement and insufficiency of those who had charge of her.

"4th. This respondent further says, that, as he is informed and believes, it is not true, as alleged in the third article of said libel, that it was impossible for said sloop Hamlet to get out of the way of the said steamboat, for the reasons supposed in that article, nor for any reason whatever ; but, on the contrary thereof, this respondent is informed and believes that said steamboat was pursuing her course, on the westerly side of the river, as aforesaid, and that said collision was occasioned entirely by the fault, misdirection, mismanagement, or incompetency of the persons having charge of the sloop, in suddenly altering and varying her course as aforesaid, and in not keeping on her course as the said sloop ought and might have done, and for which she had sufficient headway ; or otherwise through the fault, misconduct, mismanagement, or incompetency of the person having charge of said sloop. And he further says, that if the person or persons in charge of said sloop had used proper precaution or reasonable skill or care, as in duty bound to do, to avoid said collision, said collision might and would not have happened. And this respondent further says, as he is informed and believes, that every precaution was taken and effort made, and all reasonable care, skill, and diligence' used, by the persons having charge of said steamboat, to avoid such collision.

"5th. This respondent, on information and belief, denies that said sloop, at the time of said collision, was tight, stanch, or strong, but, on the contrary thereof, was old, weak, and insufficient ; and this respondent says that he is not informed, except from the libel, whether the said libellant was, at the time of said collision, or since has been, the owner of the said sloop, her tackle, apparel, and furniture, and therefore does not admit the same; but leaves him to prove the same as he may be advised.

"6th. Whether the said libellant has sustained damages to the amount of $3,500, or to any amount, by the collision aforesaid, and the sinking of said sloop with her cargo, this

Newton v. Stebbins.

respondent is not informed, save by said libel, and does not admit the same, and leaves him to prove the same as he may be advised; but this respondent insists, that neither said steamboat New Jersey, nor this respondent, is liable for any part of such damage, if any there be.

"7th. That the said collision, as this respondent is informed and believes, occurred within the body of the county of Ulster or of Duchess, in the State of New York, and not within the admiralty and maritime jurisdiction of this maritime court, and that therefore this honorable court has not jurisdiction, and ought not to proceed to enforce the claim alleged in the libel aforesaid against said steamboat, or against this respondent intervening for his interest therein; and this respondent claims the same benefit of this exception as if he had demurred to said libel, or pleaded specially to the jurisdiction of this court.

"8th. That all and singular the premises are true; in verification whereof, if denied, the said respondent craves leave to refer to the depositions and other proofs to be by him exhibited in this cause.

"Wherefore this respondent prays, that this honorable court would be pleased to pronounce against the libel aforesaid, and to condemn the libellant in costs, and otherwise right and justice to administer in the premises.

"J. Newton."

To this answer the libellant filed a general replication.

Twenty-five witnesses were examined, some of them being persons who were on board of vessels very near the Hamlet at the time of the collision, and others persons who were on board of the steamboat. In order to show the contradictory nature of the evidence, the following depositions are inserted.

For the libellant:—

"William Hallarbeck, sworn. Was pilot of Eliza Wright; first saw steamboat when a little below Blue Point, at about Barnegat, close in to east shore, and kept right along up east shore to opposite Sands's Dock, and then sheered over northwest. Witness about one third across river from west shore when steamboat came towards him heading about for him; came within three lengths of sloop. Witness shook his light, and she took a sheer west, cleared witness about as far off. Hamlet was then half way between witness and shore, a little astern of witness; steamboat kept her course west, and tried to pass Hamlet's bow; saw them strike steamboat. Hit bowsprit of Hamlet, and slewed her right round to westward; saw her sink within a minute or two; wind was very light and baffling, northeast and northwest, and every way. Witness's boom-

at time, off east; was going three to four miles through water. Witness a little above the White House, nearly opposite to it.

"*Cross-examined.* — Not quite a mile from White House, to Blue Point three quarters mile. Witness about length ahead of Hamlet, and she about half way between White House and Blue Point, and about one third of a mile from witness; she had no lights in her rigging; saw her bowsprit; night was then lit up a good deal. Witness's sloop steered well, about abeam; was going four miles to Hamlet's three, per hour; steamboat had tow-boat on west side; did not stop for collision; did not observe vessels particularly after they struck and got clear; could see hull of steamboat a mile; a small flat between White House and Blue Point, not extending one half length of sloop into river.

" Thinks steamboat passed him at rate of ten or eleven miles; does not know that she stopped her wheels before striking Hamlet; did not seem more than a minute after passing before she struck Hamlet; was room for steamboat to pass Eliza Wright on east side.

" Robert F. Osborn, sworn. Master of sloop Van Buren; was coming down river night of collision; about half across river from Blue Point, when first saw steamboat; she was then on east shore, near Barnegat, one third from shore; was then coming directly up the river, as he judged; very soon she altered so as to run more to west, and then again to about northwest; was astern of Hamlet, and a little east of her, about to end of her boom.

" Steamboat passed witness's bow; did not then know Hamlet.

" Steamboat was steering well into west when she struck sloop; saw her strike; was then thirty or forty rods off; did not, to witness's knowledge, stop her wheels before striking; judged she was going nine or ten knots; blow slewed Hamlet west; witness jibed over to clear steamboat, and kept away; was about abreast of sloop when she sunk; steamboat was close along side of her; mast was over steamboat. Sloop went down, head first. Witness thinks he was running about two miles; wind north, directly down river, and light; had kept close with Hamlet from Crumelbow.

" *Cross-examined.* — Thinks course of river about north and south at that place. Witness's sloop minded her helm when he kept away; believes steamboat backed her wheels after collision; sloop sunk within two or three minutes; steamboat lay some time after; barge of steamboat on larboard side; did not see any light in rigging of Hamlet.

" Jonathan Reeve, sworn. Was pilot of Van Buren. Wit-

ness was at helm; at time of collision, one quarter to one third from western shore, across river, right after. Hamlet thirty or forty rods, perhaps, off; saw two vessels come together; should think steamboat was going eight or ten knots, steering west-northwest to northwest course.

"Hamlet heading directly down river; wind unsteady at time; witness going about two knots; saw steamboat a mile and a half off, and thought she was on east side, and going up that side, as witness's sail shut her in; boom off east. Captain Osborn called to witness she was crossing river, and she soon opened to witness's view; did not observe that steamboat stopped her wheels till she struck; turned sloop round; head same way with steamboat; then thought she backed her wheels, and that started sloop a little backward, which rolled over to windward; then rolled back her mast towards steamboat, and sunk immediately; did not know sloop at time; had to keep away to get from steamboat.

"*Cross-examined.* — Does not think was length of sloop from steamboat when passed her; witness did not alter course of sloop before collision."

For the claimant:—

"George Dobson, sworn.   Second pilot of Buffalo; was pilot of New Jersey night of collision; was at wheel at time of collision, and from New York, except time of taking his tea; saw Hamlet a mile or more ahead, she being most to west of all the vessels; great many vessels coming down; made course to clear her, as he had all the rest from Clinton's Point up; had plenty of room, as if she had kept her course he should have had nearly one third of river; first she luffed, and witness hauled more west to avoid her; she had been running straight down the river, and was perhaps one third of a mile off when she changed her direction; when she luffed she bore more for steamboat; should have gone clear had she kept her course; fearing she would not clear steamboat, slowed her, and hollowed to sloop to keep away; then stopped steamboat, and hailed again to keep away, and saw man shove his helm down (which would luff her up); it luffed her directly round; the instant witness saw him put his helm down, rang the bell twice to back, and sloop came head into her, as nearly head on as he could judge, might be a little glancing, and she ran against steamboat; hailed with loud voice; thinks would have cleared without trouble if sloop had not luffed last time; after helm was put down, nothing more could be done on New Jersey than was done; her direction could not be changed, and could aid in avoiding sloop only by backing.

"*Cross-examined.* — That night went on board New Jersey; been three or four years in People's line; Mr. Van Santvoord sent witness to boat; does not know whether he is owner in line or not; he is one of the principal managers; Drew another, and then chief director; heard he was owner; witness hired to him as runner, but good deal of time has been pilot; has also been captain; passed more vessels that night than he ever before saw on river; first part of night very dark and bad, but had become more clear at time of collision; nothing to call witness's attention particularly to Hamlet; does not recollect passing any vessels in immediate vicinity of Hamlet; passed some below; did not pass any vessel close to eastern shore of Sands's Dock; was then one third river off west shore; began at Clinton Point to lay his course gradually across river, so as to get on west side; wanted to get to windward of vessels which had generally jibed; could in such state generally run over to west shore; sloop nearer the shore when she struck than when she sunk; thinks she sunk nearly one third of river off shore; she was dragged off by backing of New ersey, he thinks all of 200 feet or more, before she went down; sloop luffed twice; second time came dead up and direct into New Jersey; New Jersey backed twice, once when sloop was sinking.

"Been on river seventeen or eighteen years pretty steady, in all twenty-five years.

"Has run season as pilot, sometimes not on same boat."

In July, 1846, the cause came on to be tried in the District Court, when the following decree was pronounced: —

"This cause having been heard on the pleadings and proofs, and argued by the advocates for the respective parties, and due deliberation being had in the premises, —

"It is now ordered, adjudged, and decreed by the court, that the libellant recover, in this action against the steamboat New Jersey, her tackle, &c., the damages sustained by the sloop Hamlet, and the cargo on board.

"And it is further ordered, that it be referred to one of the commissioners of this court, to ascertain and compute the amount of such damages, and to report thereon to this court with all convenient speed.

"Samuel R. Betts."

On the 25th of September, 1846, the commissioner made the following report: —

"In pursuance of a decretal order, made in the above-entitled cause, on the first day of August instant, by which, among other things, it was referred to the undersigned, one of the

commissioners of this court, to ascertain and compute the amount of damage sustained by the sloop Hamlet, in her collision with the steamboat New Jersey, and the value of the cargo on board:

" I, George W. Morton, the commissioner to whom the above matter was referred, do report that I have been attended by the proctors of the libellant and claimant, and have taken and examined the testimony offered in support of the libellant's claim, and the testimony offered by the claimant in opposition thereto, and do find that the sloop Hamlet, at the time of the collision with the steamboat New Jersey, was worth the sum of $ 2,800, and the cargo on board the sum of $ 528.35, amounting in the whole to the sum of $ 3,328.35, being the damages sustained by the sloop Hamlet and cargo, in her collision with the steamboat New Jersey.

" All which is respectfully submitted.

" GEORGE W. MORTON, *U. S. Commissioner.*
" *September 25th,* 1846."

Exceptions were filed to this report, and on the 14th of October, 1846, a final decree was entered in the District Court, reducing the damages to $ 2,403.70, which amount it was adjudged that the libellant should recover, with costs.

The claimant and libellant both entered an appeal from this decree; but the libellant not perfecting his appeal, the cause went up to the Circuit Court upon the appeal of the claimant alone.

On the 10th of September, 1847, the cause was tried upon this appeal in the Circuit Court, and on the 11th of November, 1847, the decree of the District Court was affirmed, with costs.

The claimant appealed to this court.

It was argued by *Mr. Van Santvoord,* for the appellant, and *Mr. Benedict,* for the appellee.

The points made by *Mr. Van Santvoord,* for the appellant, were the following:—

I. To succeed, the libellant must establish to the satisfaction of the court, not only that the collision happened through some negligence of the persons in charge of the steamboat, but also that it happened without any fault of the persons in charge of the sloop. Bulloch *v.* Steamboat Lamar, Circ. Ct. U. S., Georgia, 8 Law Rep. 275; Abbott on Shipping, Story & Perkins's ed., p. 228, note (2); Parker *v.* Adams, 12 Metcalf, 415, 417; Spencer *v.* The Utica and Schenectady Railroad Co., 5 Barbour, 337, and cases cited therein.

And to establish the fact to the satisfaction of the court, that

the fault was not on the part of the persons intrusted with the navigation of the sloop, the libellant must show it by evidence leaving no reasonable doubt, as the burden of proof is upon him. The Catherine, 2 Hagg. 145, 154; The Ligo, 2 Hagg. 356; Lane v. Crombie, 12 Pick. 177.

II. Section 1 of Title 10 of the Revised Statutes of New York does not apply to the case of a sailing vessel and a steamboat.

The fact of the omission by the legislature to provide for the case of a sailing vessel and steamboat, approaching from opposite directions, is the highest evidence of their intention to leave such a case to be regulated by the ordinary rules and usages of navigation in such cases.

III. The case of The Friends, 1 Wm. Rob. 478, cited by the libellant below, does not apply to the case of a sailing vessel and steamboat approaching from opposite directions on the Hudson River, — for the reason, that the decision of that case rests wholly upon the view taken by the judge who decided it, of the construction and application to the case of the Trinity rules, which are of no force here.

The case was one of great obstinacy and sharp practice; both parties persisting in their course, — the steamer Menai hailing the schooner to starboard her helm, and the schooner hailing the steamer to port her helm, while either might have avoided the collision by a change of direction. The true question therefore was, Which was most to blame? and the court, on the application of the Trinity rules, considering the schooner technically right, pronounced against the claim of the steamboat.

IV. But if the rule requiring each vessel to keep to the right (which would seem to be the most usual practice on our coast, unless there is some good reason to the contrary, as in the case on appeal, Lowry v. Steamboat Portland, 1 Law Rep. 312) is applicable to the case of a sailing vessel and a steamboat, it is applicable only to the case of two vessels approaching each other in a direct line, from opposite directions, when so near that it becomes the duty of each to take proper measures to avoid a collision.

See the opinion of the court, in the case of The Friends, 1 Wm. Rob. 482, showing that the case goes on the assumption that both vessels were approaching on a *direct line*, and so near that it was the duty of each to take proper measures to avoid a collision.

V. Nor does the rule insisted on apply to the case where the vessel on the larboard tack (the steamer) is on a course so far to windward, as the vessels are nearing each other, that,

if both persist in their course, the other will strike her on the leeward side abaft the beam, or near the stern, — in which case the vessel on the starboard tack should keep off. Report of Benjamin Rich and others to the District Court of Massachusetts, 1 Law Reporter, 318.

Nor (*a fortiori*) to the case where the vessel on the starboard tack, if kept on her course, would pass at a safe distance to windward of the other vessel.

VI. The rule of navigation specially applicable to the case of a steamboat approaching a sailing vessel, which requires a steamboat to pass the sailing vessel either on the larboard or starboard side of the sailing vessel, whichever is the best method of proceeding to avoid a collision, under any given circumstances, necessarily imposes upon the sailing vessel a corresponding obligation to keep her course, and not to change her direction as the steamboat approaches near her, across the line of direction of the steamboat.

A little arithmetic will show, that a sailing vessel, proceeding at the rate of three miles or two miles an hour through the water, or even less, can change her position from a point so far out of the line of the direction of a steamer approaching her, proceeding at an ordinary rate of speed, as to render a collision inevitable; and a collision thus occasioned would be justly chargeable to the fault of the sailing vessel.

Three miles an hour is at the rate of 176 yards, or 528 feet, in two minutes; and two miles an hour, at the rate of 117 yards, or 351 feet, in two minutes.

As to the law and rules of navigation applicable to the case, see the opinion of the District Judge in the case on appeal, of which a copy is herewith furnished.

For further illustration, see also the opinion of the District Judge of New York in the case of Stout v. The Steamboat Isaac Newton, decided Dec. 23, 1848.

VII. In reference to the pleadings, the rule of pleading in cases of tort is, that it is sufficient if part only of the allegations stated in the declaration or answer be proved, provided that what is proved affords a ground for maintaining the action or defence, supposing it to have been correctly stated as proved: it is quite enough in cases of tort, if the same ground of action or defence is proved as laid in the declaration or answer, although not to the extent there stated. 1 Phillips on Evidence, 200, 205.

In this view, the allegation in the answer, that the steamboat was on the west side of the river for three or four miles before the collision, is not required to be proved in its full extent. It is requisite to show only that the steamboat was on

the west side of the river, and on a course to the westward of the sloop, a sufficient time to give the sloop reasonable notice of her direction to westward.

Nor, in this view, is it necessary to prove that a stiff breeze was blowing, provided there was sufficient wind to enable the sloop to control her movements and change her direction.

Besides, the defence is not confined in the answer to the precise statement of the manner in which the collision happened.

VIII. In reference to the evidence, the appellant will insist, —

1. That the testimony of a competent witness is to be believed, until his statement is contradicted by other testimony or evidence, from controlling facts, entitled to greater confidence.

2. That the evident misapprehensions of witnesses are not entitled to be considered as evidence. In connection with this, see Penny Cyclopædia, art. *Motion.*

3. That when it shall be shown that witnesses from the sloops, in applying the terms " north " or " northwest," " round to westward," &c., have reference to the direction of the sloop upon which the witness is placed (upon the assumption that its direction is due south), and not to the true point of the compass or the course of the river, allowance should be made for the deviation of the direction of the sloop, to ascertain the effect of the testimony.

IX. It is shown by a decided preponderance of testimony, that the New Jersey, going up the river, hauled gradually across the river, from a point on the east side, at or below Barnegat, three miles and upwards below the sloop Hamlet, coming down the river before the wind ; that she had hauled over on to the west side of the river, and within a third of the width of the river from the west shore, at or about Sands's Dock, at least a mile and a quarter below the place of the collision, and from that point, proceeding up the river, made and kept a course well in to the westward, to clear the sloop to the westward of the sloop, and on which she would have cleared the sloop to the westward, at a safe distance, but for the change of the position and direction of the sloop, from her place to the eastward of the line of direction of the steamboat across the line of direction of the steamboat, after seasonable notice to the sloop of the direction of the steamboat and so shortly before the collision as to render the collision, by reason of the misdirection of the sloop, inevitable, by the exercise of all ordinary and reasonable means to avoid the collision, which were made by the persons in charge of the steamboat.

This statement involves all that is essential for the claimant to establish, and something more.

X. There is no just ground for the imputation of negli-

gence in the navigation of the steamboat to be found in the testimony of the witnesses, of whom it can be affirmed with any certainty that they saw the steamboat, either from her rate of speed or her course in reference to other vessels, or from any sudden and unusual course in crossing the river, or from any attempt to cross the track of the sloop or run under her bows, from any point to the eastward of the sloop, within any short distance below the sloop, nor after the sloop came in sight, a mile and upwards below the place of collision; all of which errors are clearly to be traced to the mistake of the learned District Judge in confounding two points of the river, which led him to strike out part of the river in the reach in which the collision happened, of a mile in extent, and to the reliance of the learned District and Circuit Judges upon the statements of witnesses (Worden of the Illinois, and Betts of the Exertion), of whom it cannot be affirmed with any certainty that the steamboat whose course they describe was the New Jersey.

XI. No blame is imputable to the steamboat in not having a look-out down and forward on the steamboat (which at best would have been a useless precaution under the circumstances), in reference to the collision, who could only have furnished the pilot with information as to the position and course of the sloop, which he had from his own observation, in good season. The Woodrop Sims, 2 Dodson, 86.

XII. In any view of the case, there was negligence in the navigation of the sloop,—after notice of the intended course of the steamboat, as far below as Sands's Dock, to the westward,—in heading the sloop first southwest, and then hard in west, within a quarter of a mile of the steamboat, as stated by Bird, the look-out on the sloop, and in not keeping away, which ought to be a bar to a recovery. In this connection, see the case of Hurley v. The Steamboat New Champion, decided in the District Court of New York, 3d April, 1848, 6 N. Y. Legal Observer, 202, as to the respective liabilities and privileges of steamboats and sailing vessels.

XIII. If, contrary to the views of the appellant's counsel, the court should conclude, after examining the evidence, that there was blamable conduct on the part of the steamboat as well as on the part of the sloop, conducing to the collision, or if, after a strict scrutiny, it is left by the evidence uncertain on which side the blame lies, in the most unfavorable aspect of the law of the case for the steamboat, the damages should be apportioned, and each side left to bear his own costs. Goldsmith, Wells, and others, owners of the Schooner Oriana, v. The Bay State, 6 N. Y. Legal Observer, 198, and cases and authorities

cited therein; Story on Bailments, ed. 1846, §§ 608, 609, and note.

XIV. In reference to the amount of damages. (This point depended upon the evidence, which is not stated, and therefore the point itself is omitted.)

The counsel for the libellant made the following points : —

I. Steamers being of vast power and speed, and liable to inflict great injury if not carefully managed, and being also propelled against wind and tide by an overwhelming internal agency, controllable by man, are bound to take every possible precaution in. favor of vessels propelled by the uncertain and uncontrollable external winds, tides, and currents. The Perth, 3 Hagg. 415, 416; The Leopard, Daveis, 197; The Scioto, Daveis, 361 ; The Shannon, 2 Hagg. 175; The Friends, 1 Wm. Rob. 478.

II. It is also the duty of the owners of steamers to make the most safe and reliable preliminary arrangements, with a view to the safety of other vessels, and especially are they bound to employ skilful, discreet, and self-possessed pilots, and the want of such is always negligence.

III. Sailing vessels are bound to presume that steamers approaching them have competent pilots, and that they will in due time change their course, and a sailing vessel is therefore not bound to take any measures of escape; but if a steamer neglects or violates her duty till the danger becomes imminent, she will be liable for the consequences, even though the sailing vessel may make any manœuvre which, in the distraction of such a moment, may seem to her (no matter how falsely) calculated to prevent or mitigate the accident. The Leopard, Daveis, 198.

IV. In this case, it is not disputed that the sloop Hamlet, heavily laden with stone, with a light and baffling wind, at slack water, was coming down the river in the night, on the west side of the river, close in shore ; and that the steamboat New Jersey was at the same time going up the river, at quick speed, on the east side of the river, and that in eight minutes thereafter the Hamlet was sunk by a collision with the steamer, on the west shore, the Hamlet bearing all the time farther and farther west, the steamer having in the mean time crossed the river, there more than half a mile wide.

V. The steamer was in charge of a pilot, who was a mere runner on the docks, a less than half-price pilot, picked up and put in charge of the boat for the occasion, without skill, without experience, constitutionally destitute of presence of mind, and unable to cope with circumstances of complication and difficulty suddenly arising.

VI. In endeavoring to reconcile the testimony, and in considering all circumstances calculated to affect the weight of evidence, it will be perceived that the libellant's account of the transaction substantially reconciles all the testimony, and is established by the concurring testimony of eleven independent and impartial witnesses, who were on deck, awake, and observing the circumstances from different points, while the only testimony which can be called conflicting is from six witnesses, who were all abed below and out of sight, except one, the awkward pilot, who was the cause of the accident, and one other, who was occupied with the wheel of another boat.

VII. The whole evidence shows that, nearly opposite Sands's Dock, only a mile and a quarter from the place of collision, the steamer, without any sufficient reason, commenced crossing gradually to the western shore, directing her course for Blue Point, till she passed the sloops Illinois and Exertion, when she bore further westward, till she came to the Temperance, where she straightened up the river till she passed the White House, when she bore rapidly to the west, endeavoring to cross the bows of the Hamlet, and in doing so ran on to her bowsprit and sunk her. Crossing the bow nearly at right angles, the upward motion of her tow on the left side, and the downward force of the sloop on the right side, turned the head of the steamer north, and carried the sloop partly round, so that she lay across the river. See Libellant's Map.

VIII. During all this time the sloop was where she had a right to be, and doing what she had a right to do, — on a course which, *primâ facie*, it was her right and her duty to keep; and the manœuvre (luffing) which she is said to have made was one which she should make if she made any.

IX. The nearest and best course for the steamer was to continue up the eastern side of the river. This was safe for all parties; it was her probable course, and there was no reason for her crossing over, and her doing so with the river full of vessels was a neglect of that attention and vigilance which are due to the security of other vessels, and she did it at the peril of all the consequences.

X. Before the steamer passed the White House, and made the last and fatal sheer westward, there was no prospect of danger to the Hamlet. All the previous courses of the steamer gave her room enough under the sloop's stern, but when she sheered under her bows, the danger was imminent, and the collision inevitable. With a light and baffling wind, and slack water, she had no power in a minute and a half to do any thing for her safety.

XI. On questions of fact in cases of damage, where the

District and Circuit Courts, after full hearing of the witnesses and solemn argument, concur in a decree, the Supreme Court will not reverse it on the mere notes of the same testimony, unless a clear mistake or error be shown. The Sybil, 4 Wheat. 98; Cushman *v.* Ryan, 1 Story, 96, 97; Hobart *v.* Drogan, 10 Pet. 119; U. States *v.* 112 Casks of Sugar, 8 Pet. 278.

XII. This cause was decided in favor of the libellant in 1846, on a full and very expensive hearing and argument in the District Court. That decree was affirmed in 1847, after another expensive hearing in the Circuit Court, and in this court no new light has been thrown on the subject. It is a gross case of dilatory and litigious resistance to a just claim, and this court should affirm the decree of the Circuit Court, with costs in the District Court, the Circuit Court, and the Supreme Court, and with ten per cent. damages, under the seventeenth and twentieth rules, from the time of the decree in the District Court, and reasonable counsel fees. Rule 17, Rule 20; The Appollon, 9 Wheat. 362; Canter *v.* American Ins. Co., 3 Pet. 307; The Dundee, 2 Hagg. 140.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the Southern District of New York.

The suit was commenced in the District Court in admiralty against the steamboat New Jersey, to recover damages arising from a collision on the North River, in which the sloop Hamlet was run down and sunk, in October, 1846.

The libel charges that the Hamlet, a vessel laden with a cargo of flagging stones, and, of ninety tons burden, was proceeding down the river for the port of New York, and had reached a place called Blue Point, on said river; that after passing that point the wind failed, and the sloop proceeded with the force of the current, and a trifling wind, at the rate of from one to two miles the hour. That on her arrival at that point, the person in charge of the sloop descried the New Jersey coming up the river at the rate of twelve or fifteen miles the hour, and nearer the eastern shore of said river than the sloop; upon which he directed the man at the helm to head her more to the west shore, which was done. That when the steamboat arrived within a short distance of the said sloop, she altered her course to the westward, and attempted to cross the bows of the sloop so as to pass between her and the western shore, and in the act of passing, struck her bowsprit, carrying away some twelve feet of the forward part of the vessel, in consequence of which she immediately filled and sunk. That at the time of the collision it was impossible for the

Hamlet to get out of the way of the steamboat, having comparatively little headway, and being near to the western shore; and that there was room enough for the steamboat to have passed east of her, along the eastern shore of the river.

The answer of the respondent is, that, for three or four miles below the point where the collision happened, the New Jersey was coming up the river along the western shore, and westward of the course of the sloop, with a tow on her larboard of some two hundred tons burden; that it was slack water, and the wind fresh from the west; that she did not cross the bows of the sloop, nor the course she was pursuing at the time the Hamlet first appeared in sight. But that the collision arose in consequence of the sudden luffing of the sloop, by the mismanagement of the persons in charge of her; and that by reason of said improper manœuvres she ran her bowsprit into the steamboat, thereby doing great damage to her.

These are the allegations of the respective parties in the libel and answer, as to the collision complained of. And the first observation we have to make is, that, assuming the position and course of the New Jersey to be according to the statement in the answer, it by no means exonerates her from responsibility, unless the other part of it is also maintained, namely, that it happened in consequence of the false movement of the Hamlet at the time. For assuming that the steamboat was coming up along the western shore, and was pursuing that course from the time she was first descried by the hands on board the sloop, still the latter had a right to persevere in her course down the river, notwithstanding the position and course of the New Jersey; and the duty devolved upon her, according to the established nautical rule, to take the proper precautionary measures to avoid the danger.

The fact, therefore, that the New Jersey was ascending the river on the western shore for some distance below, and had not suddenly taken a sheer across from the eastern side after having pursued it till within a short distance from the point where the Hamlet was descending, is a matter of no great importance.

The real question in the case is, whether or not the accident happened, notwithstanding every proper precautionary measure had been taken on the part of the steamboat to pass the sloop in safety, in consequence of an improper movement of that vessel by the mismanagement and unskilfulness of the person in charge of her. If it did, then the damage is attributable to her own inattention and want of skill, and not to the steamboat. This must of course depend upon the evidence.

51 *

And on looking carefully through it on this point, on which, it must be admitted, it is not entirely reconcilable, and after the best consideration we have been able to give it, we feel bound to say, that this allegation in the answer is not maintained. On the contrary, the weight of the evidence is, that no substantial change in the course of the sloop, in descending the river, took place, after the precautionary one of heading more towards the western shore, when the New Jersey was first descried, some three or four miles below.

This is the testimony of the two hands in charge of her at the time, confirmed by that of the masters of vessels in the vicinity, and who witnessed the collision. The only contradictory evidence is to be found in the testimony of the pilot of the New Jersey, and in some loose conversations of the two hands after the accident had occurred, which, as detailed, is very general and indefinite, and not entitled to much consideration. This conclusion is also strengthened by the concomitant circumstances. The sloop was heavily laden, and under little headway, the wind being light and baffling, and it is difficult, under such a state of facts, to believe that her course could have been suddenly changed, by the action of the helm, to the extent, and within the time, supposed by the pilot.

We think, therefore, that the collision arose from the fault of the person in charge of the New Jersey, in not taking proper precautionary measures to avoid the sloop while endeavoring to pass her.

We cannot omit to remark, before leaving the case, that the pilot of this vessel was greatly to blame in not having slackened her speed as he approached the fleet of river-craft which was slowly descending this stretch of the river at the time it opened to his view. The channel is about half a mile wide at this point, and there were some seven or eight vessels coming down, all within a reach of less than two miles, and, from the state of the wind, not in a condition to make effectual manœuvres with a view to avoid immediate danger. And yet the clear weight of the evidence is, that the steamboat continued her speed, passing several of them, which narrowly escaped the danger, until she reached the sloop in question, at a rate of from eight to ten knots the hour.

It is manifest to common sense, that this rate of speed, under the circumstances stated, exposed these vessels to unreasonable and unnecessary peril; and we adopt the remark of the court in the case of the Rose (2 Wm. Rob. 3), "that it may be a matter of convenience that steam-vessels should proceed with great rapidity, but the law will not justify them in proceeding with such rapidity, if the property and lives of other persons are thereby endangered."

It is a mistake to suppose that a rigorous enforcement of the necessity of adopting precautionary measures, by the persons in charge of steamboats, to avoid damage to sailing vessels on our rivers and internal waters, will have the effect to produce carelessness and neglect on the part of the persons in charge of the latter. The vast speed and power of the former, and consequent serious damage to the latter in case of a collision, will always be found a sufficient admonition to care and vigilance on their part. A collision usually results in the destruction of the sailing vessel, and, not unfrequently, in the loss of the lives of persons on board.

We think, also, that the New Jersey was in fault for not having a proper look-out at the time of the collision. The pilot at the wheel was the only one, as no other person appears to have been above or on deck. It is apparent from the evidence, that, with a competent look-out, and slackened speed of the steamboat, there could have been no great difficulty in passing this fleet of river-craft in safety. The disaster, in all probability, happened from a neglect to observe these proper precautionary measures.

We think the decree below right, and that it must be affirmed.

Mr. Justice DANIEL, dissenting.

Had the cases just decided been, according to my view, regularly within the cognizance of the District and Circuit Courts, and therefore properly before this tribunal, upon the appeals taken, I could have no objection to the disposition made of those cases. The evidence appears to place the delinquency, or the wrong done, where this court has pronounced it to be; and it can scarcely be doubted, that the rules which have been prescribed for the government of vessels, propelled either by sails or by steam, when crossing each other's tracks, will conduce to the preservation of both life and property. My dissent from the decision in these cases results from considerations much higher than any that connect themselves with the mere adjustment of private controversies. It is a deduction from my understanding of the constitutional power of this court, and of the courts whose decisions we have under review, to adjudicate upon the rights of the parties, in the exercise of that species of jurisdiction which has been, as to these cases, asserted and sanctioned. That jurisdiction I feel constrained to deny. I know that my opinions, relatively to the sources and the extent of the admiralty jurisdiction of the federal courts, have not accorded with those of the majority of this court; but on these, as on all other subjects involving the integrity of the Constitution (the only true foundation of every

power in the federal government), I hold myself bound, with respect to differences of opinion, not to yield an acquiescence which, in matters of minor importance, would be cheerfully conceded. My own opinions relative to the admiralty jurisdiction vested by the Constitution in the courts of the United States have been heretofore too fully declared to render their repetition here in detail either proper or necessary. I content myself with a reference to them as expressed in the case of The New Jersey Steam Navigation Co. v. The Merchant's Bank, 6 Howard, 395, and in my concurrence with the opinion of Justice Woodbury in the case of Waring v. Clarke, 5 Howard, 467, and with reasserting the positions there maintained; viz. that the civil jurisdiction in admiralty of the courts of the United States, in tort or in contract, (with the anomalous exceptions of seamen's wages and hypothecations,) is limited to transactions occurring on the high seas, and embraces no transaction occurring either on the land, or within the bays, rivers, havens, ports, harbors, or other places within the body or jurisdiction of any county, and that cases of seizure under the revenue laws do not spring from any regular class or head of admiralty powers. My conclusions, thus stated, are fortified by the strong desire to preserve in fullest vigor that admirable institution of our Anglo-Saxon ancestors, — whose elevating influence on the character even of the humblest man is perceived in his consciousness that he forms a part, an important, nay, an indispensable part, in the administration of the laws, — the venerable trial by jury; and, in the next place, by my conviction of the duty incumbent on all to maintain, with directness and in good faith, those distinctions and distributions with respect to the judicial power which the Constitution and laws of the United States have ordained, — distributions which the power now claimed and exerted appears to confound and overthrow. Thus, in the second section of the third article of the Constitution, in a definition of the judicial power of the government, in which definition the admiralty jurisdiction is explicitly comprised, it is declared that the judicial power shall extend "to controversies between citizens of different States." This distribution of judicial power by the Constitution, Congress have carried into execution by the eleventh section of the Judiciary Act, and this court in a series of decisions has maintained. Can it, then, comport with a just interpretation, either of the Constitution or of the act of Congress, or with the decisions of this court made in conformity with both, that they should all be annulled by a seeming evasion? Can it possibly be right thus summarily to abrogate the jurisdiction of the State courts over their own territory and their own citizens? If these things can

be done, it follows, of course, that the trial by jury, and the requisite as to citizenship of parties, ordained both by the Constitution and laws, may be abolished by the mere will of persons interested, or by the fiat of a tribunal by which neither citizenship nor trial by jury is held in regard. It would be difficult to adduce a more striking example of the irregularities here pointed out, than is furnished by one of the cases now before us, — that of Newton *v.* Stebbins. This is a case which the evidence shows to have occurred between citizens of the same State, upon the narrow waters, and far within the interior of the State; and necessarily, therefore, within the body of a county of the State. It presents within that locality an instance of *simple tort*, the proper subject of trespass or case at common law; yet this case, without regard to locality or citizenship, is wrested from the tribunals of the State and the common law modes of trial, and transferred to a tribunal whose peculiar and appropriate jurisdiction, we are told by the English authorities, attaches only where there is no vicinage from which the *pais* can be summoned. I am compelled, therefore, to deny to the admiralty the constitutional authority to take cognizance of these cases.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Southern District of New York, and was argued by counsel. On consideration whereof, it is ordered and decreed by this court, that the decreee of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs and damages at the rate of six per centum per annum.