ROBERT H. McCREADY AND OTHERS, CLAIMANTS OF THE STEAMBOAT BAY STATE, HER TACKLE, MACHINERY, &C., APPELLANTS, v. GOLDSMITH, WELLS, AND OTHERS.

Where a large steamer was coming down Long Island Sound, on a foggy morning, with a speed of sixteen or seventeen miles per hour, in the direct track of the coasting trade, and run down a vessel which was lying at anchor, (the weather being perfectly calm,) the steamer was grossly in fault.

The vessel at anchor cannot be considered in fault for omitting to have horns blown or empty barrels beaten.   The usage that this is done in such a case is not established; and, moreover, it is doubtful whether such a precaution would have been of any service.

THIS was an appeal from the circuit court of the United States for the southern district of New York.

The case is stated in the opinion of the court.

The district court decreed that the collision was caused by the fault, want of precaution, and blamable conduct of the persons on board of and managing each of the vessels, and ordered the damages to be borne in equal moieties by them.   Both par-

8 *

ties appealed to the circuit court. Mr. Justice Nelson reversed the decree of the district court, and ordered that the libellants should recover against The Bay State the sum of $6,411, with interest from the 8th of October, 1849, and costs in both courts.

An appeal from this decree brought the case up to this court.

It was submitted, on printed arguments, by *Mr. Lord*, for the appellants, and *Mr. Cutting*, for the appellees.

The arguments of the counsel upon both sides consisted of comments upon the facts and evidence in the cause, which it would not be possible to explain without an abstract of the testimony.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal in admiralty, in a case of collision, from a decree of the circuit court of the United States for the southern district of New York.

The collision occurred on Long Island Sound, off Watch Hill light, on the Connecticut shore, between the schooner Oriana and the steamer Bay State, on the 13th of August, 1847, when the former was run down and sunk. The schooner was laden with coal, and on her way to New Bedford. The steamer was engaged in one of her usual trips from Fall River, through the Sound to the city of New York. On the morning of the accident the weather was thick and foggy; and so dark that a vessel could not be seen over two or three hundred feet off, and the wind at a dead calm. The schooner lay helpless on the water.

The steamer is a large vessel, some sixteen hundred tons burden, with powerful engines, and of great speed, and was coming down the Sound at the time at the rate of sixteen or seventeen miles the hour. The hands on board the schooner heard the noise of her paddle-wheels before she appeared in sight; she was within less than her length when they could first discern her; and she had approached within that distance of the schooner before that vessel was discerned by the hands on board the steamer.

The place where this collision occurred is in the direct track of the coasting trade between the Eastern States, New York, and Pennsylvania, and where the waters are greatly frequented by vessels engaged in it.

We agree, that it is not for this court to lay down any fixed and inflexible rule as it respects the rate of speed of steam vessels navigating these waters. This must depend upon the circumstances attending each particular case. These may justify a rate deemed prudent navigation at one time, that would be wholly unjustifiable at another. But we feel no difficulty in

saying, that, in a case circumstanced as the present one, a fog so dense that the most vigilant look-out would be unable to discern a vessel at a distance of more than sixty or one hundred yards—navigating, at the time, waters frequented with sailing vessels—a rate of sixteen or seventeen miles the hour is altogether inadmissible as prudent or reasonably safe navigation. According to the testimony of the pilot, it would take four or five minutes to stop The Bay State at this rate of speed; at a reduced rate, it would of course take a proportionably less time. This, in addition to the better opportunity for each vessel approaching to adopt the proper manœuvre to avoid the collision, should admonish those engaged in navigating vessels of this description, of the propriety, if not necessity, of slacking their speed in thick weather, and especially in a track where other water-craft are usually to be met.

Some of the officers on board this steamer, as is apparent from the evidence, were laboring under a very imperfect appreciation of their whole duty as regarded her proper navigation.

A passenger on board, who witnessed the collision, was struck with the impropriety of the rate of speed, and asked why they ran so fast in a fog, and was answered that it was necessary, in order to enable them to keep their reckoning in going from place to place. And we learn also from the testimony of the pilot and some others, that they make no difference in the rate of speed in consequence of a fog; that they go slow when making land, or a light, or in narrow passages, and when sounding the lead, as if the only precautions they were bound to observe in the navigation were as it respected the safety of their own vessel.

We will only repeat what we said in the case of Newton *v.* Stebbins, 10 How. 606 : " That it may be matter of convenience that steam vessels should proceed with great rapidity ; but the law will not justify them in proceeding with such rapidity, if the property and lives of other persons are thereby endangered."

We are all satisfied that this vessel was grossly in fault, on account of the rate of speed with which she was moving, under the circumstances, at the time of the collision.

The remaining question is, whether or not the schooner was also in fault. And this, in the present case, depends upon another, namely, whether she omitted any precautionary measures which she was bound to observe under the circumstances, such as beating empty casks or blowing a fog-horn, with a view to give notice to vessels approaching, of her position.

A good many witnesses have been examined as to the usage of vessels navigating the Sound, in respect to the blowing of horns, beating of empty barrels, and the like, in thick and foggy

weather; but, on looking carefully into the testimony, it will be found that no such general or established usage has been proved.

The evidence of most of the experienced masters who have been examined goes to disprove the prevalence of any such usage. The practice is occasionally resorted to in the navigation of the Sound, but with what advantage or security against accidents, does not distinctly appear. Without much more evidence of the usage, and of its utility in preventing collisions, than is shown in this case, we cannot say that the omission to comply with it is of itself chargeable as a fault against the schooner. It may well be, that the use of these means should be entitled to consideration upon a nice question of proper vigilance and caution, in a case of collision between two vessels, like any other precautionary measure that might tend to prevent its occurrence. Beyond this, we do not think the evidence as disclosed in the case would justify us in carrying the effect of the omission.

Besides, we are not satisfied, upon the evidence, that the precautionary measure of blowing horns, or ringing a fog-bell, would have been of any avail under the circumstances of this case. The witnesses on the part of the steamer agree that the noise of the motion of the vessel in the water is so great that it could be heard at a much further distance than their own fog-bell; and several of them consider the bell useless for this reason; and one of them states expressly that he did not recollect ever hearing a horn while on a steamboat when she was under way, but had after she stopped. A horn, it is said by some of the witnesses, cannot be heard, at the furthest, over a mile and a half; and if so, it certainly could not be heard any thing like that distance, if at all, on board a steamboat in motion. The steamer, as we have seen, was moving at a rate of more than a mile in four minutes; and taking into view the size of The Bay State, with her powerful engines, together with this rate of speed, it is quite apparent that if a horn could have been heard at all, it could not, upon any reasonable conclusion, in time to have materially influenced the result.

We are satisfied the decree of the court below is right, and should be affirmed.