THE STEAMBOAT NEW YORK, HER TACKLE, APPAREL, &C., THOMAS C. DURANT, CHARLES W. DURANT, AND SEPTIMUS LATHROP, CLAIMANTS AND APPELLANTS, *v.* ISAAC P. REA, OWNER OF THE BRIG SARAH JOHANNA.

18h. 223
L-ed 359
3wa273
9wa671
91 209
37f 891

Where a vessel was lying at anchor in the port of New York, and a steamboat came down the Hudson River with wind and tide in her favor, and also having several heavily loaded barges fastened on each side of her, and came into collision with the vessel which was lying at anchor, it was a gross fault in the steamboat to proceed, at night, on her way with a speed of from eight to ten miles per hour.

Moreover, the steamboat had not a sufficient look-out.

The statutes of the State of New York, regulating the light which the vessel lying at anchor was to show, have no binding force in the present case. The rule for the decision of the federal courts is derived from the general admiralty law.

Police regulations for the accommodation and safety of vessels in a harbor, may be enacted by the local authorities.

THIS was an appeal from the circuit court of the United States, for the southern district of New York.

The district court decreed that the libellant should recover against the steamboat the sum of $3,875 and costs.

The circuit court affirmed this decree, and gave judgment for $4,174 and costs.

It was submitted upon printed arguments in this court by

*Mr. Morton* and *Mr. Cutting*, for the appellants, and *Mr. Betts*, for the appellee.

The arguments upon both sides consisted chiefly in comments upon the evidence.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal in admiralty from a decree of the circuit court of the United States for the southern district of New York.

The libel was filed by the owner of the Brig Sarah Johanna against the steamboat, for a collision in the harbor of the city of New York. The brig was lying at anchor in the North River, off pier No. 6, nearer to the Jersey than the New York shore, her bow heading up the river, there being at the time a strong ebb-tide, and wind heavy from the northwest. The collision occurred between four and five o'clock in the morning of the 4th of November, 1850,—the river at this place being filled with vessels at anchor in the vicinity of the brig. The morning considerably dark.

The steamboat was passing down the North River to get round to her berth in the East River. She had in tow eleven heavily loaded barges and canal boats, the first tier being three abreast on each side of her, the other boats astern, towed by lines attached to this first tier. The steamer, with the tows, occupied a breadth of some three hundred feet, and from three hundred and fifty to four hundred feet in length, her bows projecting some sixty feet ahead of the tows. She entered this thicket of vessels, at anchor in the river, at a rate of speed from eight to ten miles an hour, and, as we have seen, with a strong ebb-tide and heavy northwest wind; and, while passing through them, the centre tow-boat of the tier on the starboard side struck the bow of the brig, smashing her timbers, cut-water, and bowsprit, and otherwise doing great damage to the vessel.

The captain of the steamboat admits that he saw the brig from three to five hundred feet off before the collision, but, as he could not stop his boat in less than within ten or fifteen of her lengths, the collision was inevitable. He admits, also, that it would have required all her power to have stopped within that distance, as it would have depended upon the way the tow-boats were managed. The rear tows were not so fastened, he observes, as to prevent their swinging, and could not have been. He gave orders instantly, on discerning the brig, to starboard the helm, and passed the same order to the tow-boats. This was undoubtedly the proper order at the time, under the circumstances, but with the rate of speed of the steamer, and encumbered as she was with her tows, it was unavailing.

Upon this statement of the facts in the case, it is manifest the steamer was grossly in fault in entering this crowd of vessels at anchor in the harbor, at the rate of speed with which she was moving, especially in the night time. A collision with some of them thus lying in her trail was the natural, if not inevitable, result. Lying at anchor, they were disabled from adopting any measure to get out of her way, and encumbered as she was with tows, she was not in a condition to adopt any prompt and effective manœuvre to avoid the danger. The continuance of the speed, therefore, under the circumstances of wind and tide, and encumbrance and embarrassment of the tows, was the grossest carelessness and neglect of duty, without the semblance of excuse. Indeed, the term carelessness hardly expresses the degree of fault; under the circumstances, it seems almost to have been wilful, or what, in degree, should be regarded as equally criminal.

The steamboat was also in fault in not having a look-out at the time, properly stationed. The captain admits that no person was stationed on the deck as a look-out. He claims to have been on that duty himself, although he stood upon the upper deck, some fifteen feet above the water, and sixty feet from the bow of the steamer, and was at the time engaged in giving directions for the management of her and her tows.

We have had occasion frequently to lay down the rule, that it is the duty of steamboats traversing waters where sailing vessels are often met with, to have a trustworthy and constant look-out, stationed at a part of the vessel best adapted for that purpose, and whose whole business was to discern vessels ahead, or approaching, so as to give the earliest notice to those in charge of the navigation of the vessel; and that the omission, in case of a collision, would be *primâ facie* evidence of fault on the part of the steamer. 12 How. 459; 10 Ib. 585.

It is insisted, however, on the part of the steamboat, that the brig was also in fault, in not showing a light while lying at anchor. We have looked carefully into the evidence on this branch of the case, and are satisfied that the clear weight of it is in favor of the libellants, and that a proper light was kept constantly in the fore-rigging, some seventeen feet above the deck.

Again, it is claimed that, admitting the brig had a light sufficient, within the requirements of the admiralty rule, still, she was in fault in not showing a light, in conformity with the statutes of New York, which required it should be suspended in the rigging, at least twenty feet above deck. 1 Rev. Stats. p. 685, § 12; also Sess. Laws, 1839, p. 322.

This is a rule of navigation prescribed by the laws of New York, and is doubtless binding upon her own courts, but cannot

regulate the decisions of the federal courts, administering the general admiralty law. They can be governed only by the principles peculiar to that system, as generally recognized in maritime countries, modified by acts of congress independently of local legislation. The Johanna was a foreign ship, engaged in the general commerce of the country, not in the purely internal trade of a State. The Bark Chusan, 2 Story, 456.

We agree, an exception to this general principle is, the regulation of steamboats and other water-craft in the ports and harbors of the States, which is required for the accommodation and safety of vessels resorting thither in the pursuits of business and commerce. These are police regulations in aid and furtherance of commerce, enacted by the local authorities, who have a knowledge of the wants of the locality, and a deep interest in properly providing for them.

We are satisfied, the decree of the court below is right, and should be affirmed.

Mr. Justice DANIEL dissenting.

I dissent from the decision just pronounced. This record brings before us what the testimony shows to be a case of simple tort or trespass, alleged to have been committed in the harbor of New York, which might have been disposed of upon principles and under proceedings familiar to the habits of the people of the country, and at a greater economy of time and expense than is necessarily incident to proceedings like those just sanctioned. I should always be reluctant, were there no considerations other than those of mere convenience, or even of habit or prejudice involved, to interfere with the local institutions or customs of States or communities. It is proper to leave to these, wherever no paramount obligation forbids it, the adoption and practice of such local institutions, or local prejudices, if they may be so denominated. Much higher and stronger is the motive for forbearing such interference, where the latter cannot be clearly traced to an undoubted legitimate authority. I hold it as an axiom or postulate, that, by the admiralty jurisdiction vested by the constitution of the United States, a power has not been, nor was ever intended to be, delegated to those courts, to supersede or control the internal polity of the States in providing for the preservation of property, or for the regulation of order, or the security of personal rights. These subjects constitute a class, the control of which is inseparable from political or social existence in the States, every encroachment upon which is an instance of unwarrantable assumption in the federal government, and of progressive decline in the health and vigor in those of the States. Especially does it seem strange to me that there should

anywhere exist a tendency to extend a system which, however attended with advantage when limited to the necessities in which it originated, must, almost in every instance, be attended with inconvenience, and not unfrequently with ruin to one side of the litigant parties, by operating the seizure and transmutation of property, and, of course, the suspension if not the destruction of all business in which that property formed a necessary instrument,—and this, too, before an adjudication upon the rights of litigants can possibly be had; and although such adjudication may be in favor of the person subjected to the consequences just mentioned. The guards which the wisdom and beneficence of the common law and equity jurisprudence of the country have thrown around the rights of property will tolerate no consequences like these; they require judgment before execution; and this single consideration, were there no other, should cause them to be cherished and maintained, rather than impugned or evaded.

The case before us furnishes a precedent, a pregnant precedent, for interference with the harbor regulations of every town in the Union, and this, too, under the ambitious and undefinable pretensions of a great system of maritime jurisprudence. Truly it may be said, that this pretension entirely reverses the maxim of that venerable, though neglected common law, *De minimis non curat lex;* a trespass in the harbor of New York would else be a quarry upon which it would disdain to stoop.

But, independently of the objection to the decision in this case, which, in my view of it, results from the absence of power under the constitution, upon the principles of justice and fairness, were there no restriction upon the powers of the court, its decision is altogether unwarranted.

The evidence, correctly compared, so far from fixing upon the steamboat the fault of the collision, shows that collision to have been very probably, if not certainly, the result of delinquency on the part of the brig. It seems to have become a favored doctrine, that, in all cases of collision between steamboats and sailing vessels, the burden of proof, either for excuse or exculpation, is to be placed on the steamboat, because it is said that she is in a great degree independent of the winds and the tide, and possesses entire control of her movements. This rule, when applied within the limits of reason and the bounds of unquestioned or obvious right as to all parties, is just, and should be enforced; but, if strained or perverted to the justification or toleration of wilful neglect, or caprice, or perverseness on the one side, and to the extension of penal infliction on those who have been involved, by the indulgence of such neglect or perverseness, the rule becomes the source of greater mischiefs than it professes to

prevent or cure. It imposes, upon an important class of interests in society, conditions and burdens incompatible with the prosperity or even with the existence of those interests. By the rule thus expounded—or if a steamer, merely because she is not propelled by the winds or the tides, is, under all circumstances, bound to avoid a vessel navigated by sails—it would follow, that should a vessel of the latter description wantonly or designedly place herself in the track of a steamer, or even put chase to her with that object, the steamer would nevertheless be responsible for the effects of a collision thus brought about.

Such an application of the rule cannot be correct. Steamers have their rights upon the waters as certain and entire as can be those of sailing vessels; and the exercise of those rights, under the injunctions of integrity and discretion, is all that can justly be demanded of them. There can be no sound reason why they should be placed upon a ground of comparative disadvantage with reference to others. Why should there be placed under a species of judicial ban a mean of navigation and intercourse which, in regard to commerce, science, literature, art, wealth, comfort, and civilization, has, in a few years, advanced the world by more than a thousand years, perhaps, beyond the point at which the previous and ordinary modes of navigation would possibly have attained? I am most unwilling to cripple or needlessly or unjustly to burden the means of such benefits to mankind by harsh and oppressive exactions.

The danger and injustice of such a course are, in my judgment, exemplified by the testimony in this case, and by the conclusions deduced by the court from that testimony.

The witnesses examined in this case are of three classes or descriptions: 1. Those who belonged to the crew of the brig. 2. Those who were engaged in the management of the steamer. 3. The owners or crews of the several barges then in tow by the steamer.

It is admitted on all sides that the night on which the collision occurred was dark, and that the brig was anchored in the much frequented and even greatly thronged track of vessels of every description,—in fact, in the very port of New York. And it is equally shown, that, by the laws of the State of New York, and by rules of the harbor, vessels thus situated are required to hoist a light at the elevation of twenty feet above the deck. There are no laws of the State, nor regulations of the port, inhibiting ingress and egress into and from the harbor during the night, nor prescribing the degree of speed at which these movements shall be accomplished; and any such regulation would be inconvenient, and, to say the least of it, useless, where the precaution of a light, such as that prescribed by the law and the regulation of

the port, was used.   And it would seem to be as absurd and as vain to prescribe a given speed to a steam-vessel entering or leaving the harbor, as it would be to attempt the same thing as to sailing vessels, whose speed, at least, must depend upon the state of the wind at the time of her progress.   Every necessity, every reasonable precaution, every guide, is supplied by a sufficient light, exhibited at the proper time and place.

The statements of the crew of the brig are vague, and by no means consistent, with respect to the precautions used on that vessel.   They cannot state the precise time at which a light was displayed, nor that at which it was taken down to be used for other than the purposes of a signal; nor do they concur as to the hour at which the collision occurred, nor as to the lapse of time between the lowering of the signal-light, for the purpose of paying out chain, and the fact of collision.   They do agree in stating the lowering, and in the use of the light for another purpose than that of a signal, shortly before the collision; and in the further important fact that the light, when up, was suspended several feet below the elevation required by the law and the harbor regulations.

It is an opinion frequently expressed, and which seems to have become trite with many persons, with reference to cases of collision, that the crews of the different vessels are almost certain to swear to such facts as will justify the conduct of their own vessel; or, in other words, will excuse or justify themselves, and cast the imputation of blame on the opposing vessel or party, even at the cost of perjury; and that, therefore, little or no faith can be given the oaths of the officers and crews of the respective vessels.   With every proper allowance for the influence of selfishness, or alarm, or falsehood, it may be remarked that extreme opinions, like the one just stated, are themselves calculated to lead to error, and would often defeat the purpose which the diffidence or mistrust on which they rest would seek to attain.   Collisions between vessels engaged in the navigation, either on the ocean or on rivers, rarely occur in the presence of spectators wholly detached from and indifferent to the events which really take place.   The scene of such events is usually on the track of the ocean, the course of rivers, midst the darkness of night, where and when there are none to testify save those who participate in the catastrophe; and if such persons, under the influence of a foregone opinion, are to be set aside as unworthy of faith, decisions upon cases of collision will, and indeed must, become so entirely the result of conjecture, or of an arbitrary rule, as to challenge but a small share of public confidence; and what is of more importance, may be the instruments of injustice and oppression.   The error and inconsistency of this rule

is strikingly exemplified in the present instance, in which it is seen that the testimony on which the decision professes mainly to be founded is said to be that of the captain of the steamer, the party said to be in default—a source of evidence denounced by the rule as unworthy of belief. It so happens, however, by a conjuncture quite unusual, that the case before us is placed beyond the operation of the rule of evidence above adverted to. Of the fourteen witnesses who testify on behalf of the defendant in the libel, seven of them did not belong to the steamer. They were composed of the masters and crews of the barges then in tow of the former, and whose lives and property were imperilled by any misconduct of her conductors, with regard to whom there is no conceivable ground for bias or partiality on the part of these witnesses. Yet it is explicitly declared by them all—and they all appear to have been awake and in a situation to observe what was passing—that not one of them saw a light of any description or in any position displayed from the brig; that the latter was perceived as a dark spot upon the water, only when approached so closely as to be at the immediate point of collision. It is incomprehensible to my mind how this could have been the case had there been lights from the brig, and especially at the proper elevation prescribed by law. Such lights must have been in some degree perceptible, instead of the vessel being perceived only at the very point of contact, as a dark spot upon the water. But if in truth the brig had lights at all, provided they were placed in a situation to render them invisible, or on a place below that prescribed by law, she is as obnoxious to censure as if she displayed no lights. The steamer is proved to have been abundantly lighted. To excuse a departure from the law, either in failing to exhibit any lights, or displaying such as were insufficient or placed in an improper position, and still more to make such delinquency the ground of reclamation for injuries resulting therefrom, appears to me to be the award of a premium for a breach of duty, and an invitation to similar offences by others.

Without a further detail of the testimony in this case, I must say that the preponderance of that testimony is, in my judgment, against the libellant upon the merits. Independently, therefore, of the objection to the jurisdiction of the court, were I at liberty to disregard that objection, I think that the libel should not have been sustained. Upon the question of jurisdiction, it is my opinion that the libel should have been dismissed apart from the merits, and that the case should by this court be remanded to the circuit court, with directions to dismiss the libel, with costs.