### THE LOUISBURG.

### GOULD v. DAVIS et al.

### SAME v. MORRIS et al.

#### (Circuit Court of Appeals, First Circuit. June 30, 1896.)

#### Nos. 164 and 165.

1. COLLISION—STEAMER AND SAIL—IMPROPER FOG HORN.
   A schooner which has not the mechanical fog horn required by law, but some other sound-making apparatus, has the burden of showing, in case of collision with a steamer in a fog, that the want of a proper fog horn did not contribute to the collision. Per Webb, District Judge.

2. SAME—CHANGE OF COURSE BY SAIL.
   A change of course by a small schooner upon the sudden looming up, out of the fog, of a large steamer, heading directly for her, held a fault in extremis, there being apparently little time to determine what was the safest thing to do. Per Webb, District Judge.

3. SAME—EXCESSIVE SPEED IN FOG.
   A speed by a steamer of seven knots an hour in a fog so dense that a schooner with which she collided could be seen only at a distance of a little over 100 yards held excessive.

Appeals from the District Court of the United States for the District of Maine.

These were libels growing out of a collision. The first was filed by Walter L. Davis and others, constituting the Portland Packing Company, against the steamship Louisburg (Horace W. Gould, claimant), to recover for loss of cargo shipped by libelants on the schooner Valorous, and lost by reason of a collision between the two vessels. The second libel was filed by William E. Morris and others, owners of the Valorous, against the Louisburg, to recover for damages inflicted upon their vessel.

The following oral opinion was delivered in the district court, at the conclusion of the arguments in that court, by WEBB, District Judge:

The principles of law involved in the case are not unusual, or of so intricate a character that I think it necessary for me to take any time to look at the authorities. They are quoted over and over again, and are familiar to all of us. Now, there is a peculiarity about this case, and it is the little actual conflict of evidence. As to the place, the time, the general direction of the wind, the general courses of the two vessels, and the state of the weather, there is a substantial agreement. If you come to matters of exactness as to the wind and courses, the statements on the part of the steamer are probably a little more exact, because they come from the man who was at the wheel steering, with the compass directly before him, and who would have a better opportunity to know than the others, who state a general impression; but the difference is so slight that it is of very little consequence. The collision was between a steamer and a sailing vessel. The familiar principle of law is that the sailing vessel is to keep her course, and that the steamer is to keep clear. As has been stated by the respondent here, the duty of the steamer is imposed upon her upon the condition that the sailing vessel complies with what is required of her. In other words, the sailing vessel must not, by any action on her part, interfere with, embarrass and defeat the steamer in the employment of proper means to perform her duty.

This case brings in also the element of the fog, and the duties of the two vessels when proceeding through the fog. The first duty upon the part of both, resting upon both alike, is to give warning of their presence and proximity by sound signals, the character of the instrument to produce the sound being prescribed for each. The courts have held, and held repeatedly, that vessels are not warranted in substituting for the prescribed sound-making implement something that may be supposed to be an equivalent. So that in this case the schooner was required to have a mechanical horn, which should be sounded at proper intervals, a single blast, and the steamer to have a whistle, which should be sounded at proper intervals in a certain way. The schooner did not have a proper fog horn. She had some other fog horn. But it is a perfectly familiar principle that even an inexcusable omission to do something, if it in no way contributes to the disastrous result, is not to be resorted to, to hold a vessel responsible, as on the familiar principle that if a vessel is not carrying her lights on a full moonlight night, where she was seen, and seen for a long distance, the absence of lights not in any way contributing to the collision, she would not be held responsible. So it is with a sound signal or the possession of a proper mechanical fog horn. If it can be shown that its want was entirely ineffectual, without influence upon the result that followed, it would not make the vessel liable; but the burden of showing that it was not in any way a contributing cause rests upon the vessel which is deficient in that particular respect. It is argued here now that it must be true that the absence of a mechanical horn in no way contributed to this disaster, because the testimony is that certain signals were given, and that they were not heard; that is to say, the schooner claims to have given certain sound signals, and the steamer's company denies that there were any of them heard. On the other hand, all the witnesses from the steamer say that whistles were blown, and all the witnesses from the schooner deny that they were heard. It is therefore argued that whatever sounds might have been given by a fog horn would have been no more heard than the sounds of the whistle and the horn that were used. My principal trouble about that argument is this: While I am fully persuaded from the evidence that the various whistles which the witnesses on the part of the steamer have testified to were given, I am not so thoroughly convinced that they were not heard on board the schooner, and for this reason: It is admitted by every man on board the schooner that a long blast, and three short blasts immediately following, indicating a reversal of the engine and full speed astern, were heard on board the schooner. There is no suggestion of any difference in the condition of the atmosphere, or the surroundings, or anything else, which would have allowed that whistle to have been distinctly heard, as testified to, when only a minute and a half before, on board the schooner, it was entirely silent. Now, that evidence is a very troublesome fact. If you are going to undertake to sustain the contention of the witnesses from the schooner that the steamer's whistles were not heard at all on board the schooner, where they admit that a long blast was given when they came in sight of each other, and three short blasts immediately following, indicating a reversal of the engine

and full speed astern, were heard on board the schooner, there is no apparent or probable change in the surrounding conditions to justify me in holding that a blast from the same whistle, from the same or substantially the same situation, only a minute before, could not have been heard on board the schooner. So, I must come to the conclusion that the schooner has not satisfactorily established the proposition that the want of a mechanical fog horn in no wise contributed to the collision, or established the fact that the possession and use of a suitable fog horn would not have given the steamer an earlier warning of her proximity. For so much, I think, she is in fault.

As to her change of course, I am of the opinion, and have been from the beginning, watching the whole case, that, although she did not make the change of course wisely, it was made under such circumstances of extremity as might be justified under excitement. A large steamer, of 1,200 tons, comes suddenly out of the fog, close upon and aiming directly at her. How far away there was not much time to estimate very closely or accurately, and how fast she was approaching was but a mere matter of conjecture; but the tendency of the fog was liable to exaggerate the danger from both of those causes, even to persons of calm nerves and much self-possession. That she was not in such a position that the collision was unavoidable under any circumstances or adoption of any measures is not established. The witnesses upon either side say, in their judgment: "Had such conditions as I believe to have been judicious and proper been resorted to, we probably would have gone clear; but there would have been a very short space between us, hardly the length of the schooner, or hardly the length of the steamer; but I think probably we would have gone clear." It is all an estimate, and all a close shave; and in that situation of things, with the steamer rising up over this little schooner of 57 tons, with no great time to determine what was the safest thing to do, the change, under the extremity, I think, was excusable, and the schooner should not be held responsible for that. As to her speed, I think she was going faster than could have been justifiable, in case that speed defeated her own ability—diminished her power—to guard against the things which she was bound to guard against. But, inasmuch as she was going on her course,—so far as this vessel was concerned, a course which she was bound to keep,—I do not think her speed contributed to this disaster. She was going under all the sail she could carry. She had not slackened anything. Her staysail had been taken down for repairs, and her topsail had been reduced because it had been torn, according to the testimony of one witness. So she had every stitch of canvas on her which she was able to carry; but I do not think her speed contributed to the disaster.

Now, I come to the steamer. All those calculations which, by measuring the distances, the taking of time, and estimating the speed revolutions, the working of her engine, undertake to determine the rate of speed at which she was going, are, in my judgment, delusive, unreliable, untrustworthy. As, for instance, there is no allowance made, and there can be no allowance made, for the time she was running full speed ahead. Over all this time there were intervals when she was running full speed ahead. We have not the exact time. The quantity has not been exactly measured. How fast the steamer was running from the time she left Scatari until she came to the point of collision, so as to know exactly the rate of speed she was making within an hour or half hour of the time of this collision (for this is the time that really concerns her), I do not believe is ascertainable at all. There is a difference in the estimates on the part of the schooner and on the part of the steamer. If I remember rightly, the general estimate on the part of the steamer is that she was going over the ground at the time of the collision at the rate of between 4½ and 5½ knots. What was the weather? According to her own testimony, the fog was so thick that this schooner could be seen only a very slight distance over 100 yards. I allow a little distance more than 100 yards for the progress of the schooner on her way between the last glance in that direction and the next. It would not be much. The suggestion is, and the expression of opinion is, that it would be possible to bring this steamer, loaded as she was, to a standstill in about one length, and her own length is 87 yards,—261 feet. With this measurement and estimate, for a vessel to be proceeding in a fog as thick as that was, at a rate of speed which would prevent her being brought to a standstill certainly within the distance within which a vessel could be seen, or which would prevent her from

taking such necessary steps as might become necessary for the protection of the vessel which she was to keep clear of, I hold was too fast. I do not think that any so safe rule can be laid down to determine and interpret what can be meant by moderate speed in the fog, as that rule which says such rate of speed as gives the party the necessary control for discharging his obligation to other vessels if he came upon them; and that, manifestly, in this case, he could not do. I do not regard it as by any means sure that whether the steam vessel had starboarded her helm or ported her helm, or whether the schooner had kept her course or luffed up as she did, would have made an avoidance of this collision possible under the circumstances, with the speed at which the vessels were going. I must hold that the steamer was going at too high rate of speed for that state of the weather, and is therefore responsible. As to porting her helm, I am inclined to think it was the right operation. Of course, something, in such a matter, depends upon the actual relative positions of the vessels and their relative movements; but it is perfectly plain that with vessels crossing each other's paths at right angles, or substantially at right angles, and quite close to each other, starboarding the helm would have been sending the steamer along in the same direction that the schooner was going, and the advance of each was tending to bring them together, unless one advanced fast enough to get across the line and out of the way of the other; while, turning under a port helm, the movement of the two vessels would be away from each other, instead of coming towards each other, as they must have done. I think that the porting of the helm was a proper maneuver on the part of the steamer, —a wise one; so that I shall hold that to have been no fault on her part.

My conclusion, therefore, is that it was the fault of both vessels,—fault on the part of the schooner for the lack of a proper sound-making apparatus, which she does not show did not contribute to the disaster; fault on the part of the steamer for running at too high rate of speed in the fog. The result will be that, as to the libel between the two vessels, the damages must be divided. As to the libel on the part of the owners of the cargo, it has been admitted by the counsel here that they are entitled to full compensation for their loss. If they cannot collect the proper proportion from each of the parties contributing to the wrong, they have the right to collect unequal shares, or even the whole from the party able to respond. The first thing will be to determine the amount of these damages. A mere interlocutory decree of liability on the part of both may be entered; and, if the parties are prepared to express to me their choice of an assessor or master, I will have the order now entered. Upon the coming in of the report of the master, I will hear the parties upon the settlement of a decree in any form they may agree upon.

I should say that I believe that the steamer had a proper lookout, and I should think that the schooner's lookout was quite an inadequate one, deafness being the principal drawback as to him. The fact that he had merely shipped to work his passage makes no difference. When he went aboard of the schooner, he became liable to do ship's duty, subject to the order of the master, if he was a competent man, just as much as any other man.

Lewis S. Dabney and Clarence Hale, for appellant.

Joseph Simonds, David W. Snow, Charles S. Cook, and Benj. Thompson, for appellees.

Before COLT, Circuit Judge, and NELSON and CARPENTER, District Judges.

PER CURIAM. We agree with the conclusion of the district court that the steamship Louisburg was in fault in running at too high a rate of speed in the fog, which we find to have been at least seven knots an hour through the water. As this is the only question raised on these appeals, our decree in each case is: The decree of the district court is affirmed, with interest, and with costs for the appellees in this court.