PENNELL et al. v. UNITED STATES.

THE WINOOSKI.

(District Court, D. Maine. March 30, 1908.)

No. 20.

1. COLLISION—STEAM AND SAILING VESSELS—EXCESSIVE SPEED OF STEAMER IN
FOG.

Under rules 20 and 21 of the navigation rules of 1864, which required a
steam vessel to keep out of the way of a sailing vessel and to go at a
moderate speed in a fog, and the rule of decision requiring a steam ves-
sel to proceed at such reduced speed in a fog as to be able to reverse her
engines and come to a standstill before colliding with a vessel which she
ought to see, the United States gunboat Winooski, proceeding at night in
a dense fog 35 or 40 miles off the coast of Nova Scotia, and in the track
of vessels on the way to or from Halifax, at a speed of seven knots an
hour, was going at an excessive speed, and was in fault for a collision
with a brig not shown to have taken any action to embarrass the steamer
in the performance of her duty or to have failed in any way to duly
apprise the steamer of her approach.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 170.

Collision rules—Speed of steamers in fog, see note to The Niagara, 28
C. C. A. 532.]

2. SAME—SPEED OF SAILING VESSEL—EVIDENCE.

A speed on the part of the brig of 3 or even 3½ knots an hour, which was
barely sufficient to give her steerageway, was not excessive, and evidence
that her speed did not exceed that rate is entitled to credence, in the ab-
sence of any entry in the log of the steamer, which was very complete
and full in giving the details of the disaster, indicating that the brig was
going at excessive speed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 171.

Collision rules—Speed of sailing vessels in fog, see note to The Mount
Hope, 29 C. C. A. 368.]

3. SAME—LIGHTS—EVIDENCE.

Direct and positive evidence from the brig that her lights were properly
lighted and set 45 minutes before the collision is sufficient to establish the
fact that they were burning at the time of collision, when corroborated by
the log of the steamer, kept by the acting master, stating that the brig's
lights were reported and were seen by him immediately before the collision,
as against the testimony of persons from the steamer that they were not
burning when they went on board the brig after the collision, which was
of such force as to throw her substantially on her beam ends.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 123.]

4. SAME—LOOKOUT—FOG SIGNALS.

Evidence considered, and held to show that the brig had a proper look-
out, that he was sounding the fog horn at shorter intervals than required
by the rules, that his failure to hear the fog whistle of the Winooski was
not a fault and was immaterial, as it was heard by the mate in charge,
and that the brig was in no way chargeable with fault contributing to the
collision and could not have avoided it after hearing the whistle, but that
it was due solely to the excessive speed of the gunboat.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 151.]

5. SAME—SUIT FOR COLLISION—EVIDENCE.

Where one of two vessels in collision charges the other with faults,
which if the charges are true would have been obvious, the fact that her
own log, written at the time, makes no mention of them, is significant and
tends to discredit her claim.

In Admiralty.

Bird & Bradley and Benj. Thompson, for libelants.
Robert T. Whitehouse, U. S. Atty.

HALE, District Judge. This suit is begun by a petition brought by virtue of a special act of Congress of February 24, 1905, 33 Stat. 810, c. 777, which refers the subject-matter to the examination and adjudication of the District Court of the United States for the District of Maine, and provides that the practice shall be in accordance with the rules of practice and procedure in admiralty.

The suit is to recover damages arising from the loss of the hermaphrodite brig Olive Francis of Machiasport, Me., by collision with the United States gunboat Winooski on the 30th day of July, 1866, 45 minutes after midnight.

The Olive Francis was an hermaphrodite brig, 110 feet long, and of the burden of $293^{23}/_{95}$ tons. At the time of the collision, she was proceeding in ballast from Boston to Glace Bay, Cape Breton, for a cargo of coal. About noon on Sunday, July 29th, she tacked ship off the harbor of Halifax, Nova Scotia, with all sails set except her studding sails. The wind was southwesterly and was light and baffling. Just before dark, a thick fog set in. Her royal was then taken in, and she proceeded closehauled, with her starboard tacks aboard, until the time of the collision.

The gunboat was a side-wheel steamer, 250 to 275 feet long, and of 974 tons burden, carrying 10 guns. She was proceeding along the Nova Scotia coast on a voyage westward, having left the Gut of Canso on the morning of July 29th. At the time of the collision, the sea was smooth, there was a thick fog, and the wind was from south to southwest. The petitioners contend that the collision arose from the great speed of the steamer and lack of proper efforts on her part to avoid the brig. The government contends that the rate of speed of the steamer was prudent and safe, in view of the skill and care exercised and of the precautions taken in navigating her, and in view of the reciprocal precautions required by law from other vessels. It contends, further, that the collision was caused: First, by the excessive speed of the brig; second, from the fact that the brig did not have proper lights; third, that she did not have a sufficient lookout; fourth, that she did not sound fog signals; fifth, that, upon hearing the whistle of the gunboat, she did not give some special signal to warn the steamer; and that she was also in fault for putting her helm hard astarboard.

1. Was the gunboat going at a moderate speed?

The navigation rules of 1864 were in force at the time of the collision. The following rules have a bearing upon the questions now before the court:

"Rule 20. If two vessels one of which is a sailing vessel and the other a steam vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel.

"Rule 21. Every steam vessel when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop her engines; and every steam vessel shall, when in a fog, go at a moderate speed."

"Rule 23. Where by rules 17, 19, 20 and 22 one of two vessels shall keep

out of the way, the other shall keep her course, subject to the qualifications of rule 24."

Rule 24 relates to special circumstances, rendering a departure from the rules necessary in order to avoid immediate danger.

More than 40 years have elapsed since the events happened which form the subject-matter of this controversy. The able proctors on both sides have shown great care and ability in placing before the court all the testimony that can be obtained after the lapse of so long a time and the death of many of the participants. Upon the question of speed, the evidence is quite extended and somewhat contradictory. The testimony of Rear Admiral Casey is important and persuasive, especially when taken in connection with the log. Admiral Casey was the navigator and acting executive officer of the gunboat. He is a mariner and a naval officer of great experience and ability. He testifies frankly and with great detail. He went below just after midnight. After evident reflection and with care, he fixes the speed at that time at "not much over seven knots. I say seven knots." He testifies, further, that from the practice of the ship the speed throughout the hour from 12 to 1 o'clock would be the same. He admits that the approved practice and principles of seamanship and steam navigation require that, under the conditions of sea and weather at the time of the collision, he should slow the ship to a speed that would make her readily manageable. His opinion is that six or seven knots would be a very good speed; that such speed gives good command of a ship in a fog, so that she will answer her helm and keep out of the way of other vessels; that he regarded it as good seamanship to keep the Winooski under the conditions that she was at the time of the collision and at the rate of speed at which she was proceeding; that at such rate she would answer her helm better than when going at three or four knots. But he says that, when running in for the shore, as when approaching Machias Harbor, he would keep her at three or four knots an hour, so that her headway could be stopped quickly. And he admits that she would have steerage way at three or four knots, although "sluggish." He regards seven knots as a proper speed in a dense fog, although he says the gunboat could be stopped more quickly at three or four knots, but could not change her course so quickly as if going faster. His testimony is important with reference to the force of the blow when the gunboat struck, and shows that she must have been going at great speed. He says it was like striking a reef, and that it never occurred to him that she had collided with a vessel. There is testimony from another source that the shock from the collision was as if the vessel had "struck a rock." The effect of the blow on the hull of the brig substantiates the fact that the gunboat was proceeding at a high rate of speed. The blow was at about right angles. It listed the brig over three feet. It was "right into her eight or ten feet." A careful examination of the log confirms the evidence relative to speed. The steam log indicates that the gunboat maintained a substantially uniform rate of speed of nine knots an hour, on July 29th from 11 a. m. to 11 p. m. At the latter hour the order was given and recorded to slow to twelve revolutions, or to a little more

than half speed. And I do not find from the deck log or the steam log that after 11 o'clock there had been any change in conditions affecting the speed. Admiral Casey was, I think, correct in fixing the rate of speed at "seven knots at least." I cannot escape the conclusion that this was her speed at the time of collision.

In Palmer v. Merchants' etc., Co. (D. C.) 154 Fed. 683, I have lately had occasion to consider some of the later decisions in the matter of speed in a fog. In the case at bar the question arises under the navigation rules adopted by Congress in 1864. Under those rules, however, the question is not materially different from that which arises under the present rules. Indeed, before 1864, the law in regard to speed in a fog was well determined in this country under the rules laid down by Judge Sprague and other eminent authorities on maritime law. And, before the statute of Victoria 25 and 26, in the early days of steam navigation, there are well-considered decisions in England on this subject, recognizing the necessity for steam vessels to proceed at a moderate speed in a fog or in dark and rainy weather. From the statute of Victoria, Congress drew much of the maritime legislation of 1864.

Under rule 21 of the statute of 1864, The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687, is a leading authority. In that case, in speaking for the Supreme Court, Mr. Justice Blatchford said:

"It is contended for the steamer that she was not guilty of any neglect in going at the rate of speed found. Her full rate of speed was between 13 and 14 knots an hour. When she first overhauled the schooner, her speed was between 6 and 7 knots an hour, and she kept up the latter speed until she reversed her engines on suddenly sighting the schooner in the fog, about 500 feet away. * * * The steamer was bound to keep out of the way of the schooner, and the burden rests upon her to show a sufficient reason for not doing so. She must be held wholly responsible, unless she shows a fault on the part of the schooner which contributed to the collision, or that it was due to unavoidable accident."

While the same rules were in force, there are numerous decisions on this question. In The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148, a case of collision between steam and sail occurring in 1869 about 200 miles off Sandy Hook, seven knots in a dense fog is held to be immoderate speed. In this circuit, in The Monticello, 1 Holmes, 7, Fed. Cas. No. 3,971, a case of collision in 1870 on the open sea 30 or 40 miles from Cape Lookout, Judge Shepley held the steamer's speed of 8 miles (less than seven knots) to be excessive. In that case he said that the "speed should be more moderate according as the fog is more dense." In The Eleanora, Fed. Cas. No. 4,335, Judge Blatchford's language is to the same effect. I have had occasion in other cases to cite The Colorado, 91 U. S. 692, 23 L. Ed. 379, a case of collision between steam and sail in 1869 on Lake Huron, where Mr. Justice Clifford holds that, in a fog, "slow speed is indispensable, and that the courts require very slow speed, just sufficient to subject the vessel to the command of her helm." He adopts substantially the English rule that a steam vessel is going at an immoderate speed if she is going at such speed to make it "dangerous to any craft which she ought to have seen and might have seen." He held a rate of five or six miles

an hour an excessive speed. The following cases in point were decided under the rules of 1864: The City of Gautemala, 8 Ben. 521, Fed. Cas. No. 2,747; The Hansa, 5 Ben. 501, Fed. Cas. No. 6,037; The Louisiana, 2 Ben. 371, Fed. Cas. No. 8,537; The Franconia, 4 Ben. 181, Fed. Cas. No. 5,049; The City of Panama, 5 Sawyer, 63, Fed. Cas. No. 2,764; The D. S. Gregory, Fed. Cas. Nos. 4,099, 4,103; The Leo, 11 Blatch. 225, Fed. Cas. No. 8,254; The Alberta (D. C.) 23 Fed. 807; The Luray (D. C.) 24 Fed. 751; The Blackstone, 1 Lowell, 488, Fed. Cas. No. 1,473.

It is interesting to trace the earlier cases prior to the law of 1864: Newton v. Stebbins (1850) 10 How. 586, 13 L. Ed. 551; McCready v. Goldsmith (1855) 18 How. 89, 15 L. Ed. 288; New York v. Rae (1856) 18 How. 223, 15 L. Ed. 359; Rogers v. St. Charles (1856) 19 How. 108, 15 L. Ed. 563; The City of New York, Fed. Cas. No. 2,759; The Northern Indiana (1853) Fed. Cas. No. 10,320.

In The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053, in speaking for the Supreme Court, Mr. Justice Brown says:

"The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precautions as will enable her to stop in time to avoid a collision, after the approaching vessel comes in sight, providing such approaching vessel is herself going at the moderate speed required by law."

In The Chattahoochee, 173 U. S. 540, 548, 19 Sup. Ct. 491, 43 L. Ed. 801, Mr. Justice Brown further explains the rule which he had followed in The Umbria, supra, and says:

"While sailing vessels have the right of way as against steamers, they are bound not to embarrass the latter either by changing their course or by such rate of speed as will prevent the latter from avoiding them."

Mr. Justice Brown thus indicates the reason for stating the rule as he did in the case of The Umbria. The doctrine of the courts is that the speed of a steamer must be judged by all the circumstances of the case; that the action of the approaching vessel may be one of the vital circumstances. She must not embarrass the steamer either by changing her course or by changing her speed or by proceeding at such speed that the steamer will not be able to avoid her, even if such steamer is under perfect control and proceeding at a moderate rate of speed.

In The Louisburg, 75 Fed. 424, 21 C. C. A. 424, Judge Webb said:

"The familiar principle of law is that the sailing vessel is to keep her course, and that the steamer is to keep clear. As has been stated by the respondent here, the duty of the steamer is imposed upon her upon the condition that the sailing vessel complies with what is required of her. In other words, the sailing vessel must not, by any action on her part, interfere with, embarrass, and defeat the steamer in the employment of proper means to perform her duty."

In that case, Judge Webb held that a speed of seven knots an hour in a dense fog at a point off the coast of Nova Scotia in a somewhat frequented part of the high seas was excessive.

The learned proctor for the government has argued with great force and ability that even the strictest construction of the rules of naviga-

tion relating to speed does not require a steamer to lie to or anchor; that moderate speed does not mean no speed at all; that such steamer is not required to stop at the first signal heard by her unless its proximity be such as to indicate immediate danger; and that the obligations to slacken speed, and if necessary to stop and reverse, do not become operative until those in charge of the steamer know that they are approaching another vessel. In support of his contention, he cites The Leland (D. C.) 19 Fed. 771, The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620, and other cases. But these cases are not inconsistent with the rules laid down in the cases which I have cited. The doctrine of maritime courts is that a steamer in a fog must not run at such speed as to prevent her from reversing her engines and coming to a standstill before she shall collide with a vessel which she ought to have seen. This doctrine is well stated by Judge Wallace in The Etruria, 147 Fed. 216, 77 C. C. A. 442.

In the case at bar, as in The Nacoochee, supra, and The Umbria, supra, the duty is imposed upon the steamer by law to keep clear of the sailing vessel. The burden of proof is upon her to show fault upon the part of the brig, or to show that the collision was due to inevitable accident. There is some dispute as to the location on the high seas where the vessels came together. It appears that the brig made her last tack, previous to the collision, off Halifax Harbor, just before the fog shut in, about noon Sunday, July 29th, and that she proceeded, with her starboard tacks aboard, closehauled, until the time of the collision. In the light baffling wind her course could not have been steady, and it is impossible to determine at precisely what point she had arrived at midnight. The learned proctor for the government contends with great earnestness that she must have been at a much greater distance from the coast than is admitted by the petitioners; but from all the evidence I am persuaded that the conclusion of the petitioners is not far out of the way, and that she was about 35 or 40 miles off the coast of Nova Scotia.

The place where the two vessels came together was not in one of the great paths of commerce, but it was in a place frequented by vessels going to and from the Gut of Canso and ports to the eastward. It was also in the path of vessels proceeding to and from Halifax. In such a place, in my opinion, a speed of 7 knots an hour in a dense fog is not moderate speed. Indeed, I must find that the admitted speed of $6^6/_{11}$ knots an hour, under all the circumstances, was not a moderate speed in a dense fog.

I have no doubt that the opinion expressed by Admiral Casey that seven knots is a proper speed in a dense fog is the opinion shared by many other mariners of great ability and experience. Courts have often commented upon the fact that masters of steamers are prone to lay great stress upon the necessity of keeping a steamer going at a high rate of speed in order that she may answer her helm quickly, but it is impossible for courts to overlook a plain breach of the written law that steamers in a fog must proceed at such reduced speed as to be able to reverse their engines and come to a standstill before colliding with a vessel which they ought to have seen. In The Cambridge, 2 Lowell, 21, Fed. Cas. No. 2,334, Judge Lowell comments up-

on the fact that the doctrine of courts must prevail over the learning of mariners.

The learned proctor for the government has cited The Colorado, supra, and The Alberta, supra, and insists that a steam vessel is under the duty only of adopting such rate of speed as would place her headway under such ready command that she can be stopped within such distance as other vessels can be seen by her, under the assumption that such other vessels will do their duty in apprising her of their proximity. These cases would have great force if there were a different state of facts in the case at bar. But the whole testimony convinces me that no action of the brig defeated the gunboat in the employment of proper means of performing her duty. I cannot find that the brig failed in any way to apprise the gunboat of her approach.

I find, then, that the gunboat was in fault, in that she was not going at a moderate speed in the fog, and I am of the opinion that the immoderate speed of the gunboat in the fog was the cause of bringing the vessels into such a position when they first came in sight of each other that it was impossible to prevent a collision, and that thus her speed in the fog was the initial cause of the collision.

2. Was the brig going at a moderate speed in the fog?

There was a light baffling wind, about a 3-knot breeze. Sometimes the brig's sails were full, and sometimes they were flapping. The whole testimony induces the belief in my mind that, while her speed varied with a baffling wind, the brig was not proceeding at any time at a speed materially above 3 knots; certainly not at a greater speed than 3½ knots. The testimony shows, too, that this speed was only sufficient to give her steerage way. The evidence is that, when the fog set in, the royal of the brig was taken in, that the brig then proceeded with little more than steerage way, and at the time of the collision she was going at "3 knots an hour." Neither of the logs upon the gunboat ascribes immoderate speed upon the part of the brig as the cause of the collision.

In The Etruria, supra, in drawing the opinion for the Court of Appeals of the Second Circuit, Judge Wallace, under similar circumstances, held that the absence of any entry in the log was a "suspicious circumstance."

In The Richmond (D. C.) 114 Fed. 208, Judge Waddill held that the claim that the collision was due to the failure of the schooner to show proper lights was materially weakened by the fact that the omission was not mentioned in the steamer's log.

It may further be said, with reference to the omission in the steamer's log in this case, that the log is very complete and full, and the court cannot escape the conclusion that, while the log recites in detail so many things in regard to all the matters relating to the disaster, it would not have been likely to remain silent about so material a circumstance as the fact that the brig was going at an immoderate rate of speed.

I cannot conclude that, under the circumstances, a speed of 3 knots, or even of 3½ knots, an hour was an immoderate speed. In the case of Palmer v. Merchants' etc., Co., supra, I have considered many

cases in which courts have distinctly held 4 knots an hour to be moderate speed under circumstances similar to those in the case at bar.

In The Nacoochee, supra, the Supreme Court held that a speed of four miles an hour off Cape May was not excessive speed. The Supreme Court reversed the court below in holding the sailing vessel at fault for excessive speed and for other causes. The Colorado, 91 U. S. 692, 23 L. Ed. 379; The Vedamore (D. C.) 131 Fed. 154; The Furnessia (D. C.) 137 Fed. 955.

I find therefore that the schooner was not proceeding at an immoderate speed in a fog, and was not in fault.

3. The government accuses the brig of fault in failing to have lights properly set and burning at the time of the collision.

The government's contention that there were no lights is based upon the testimony that when Admiral Casey came on board the brig he saw no lights, that when Bennett rowed around the brig he saw no lights, and that after the collision lanterns were found aboard with the lights out. Against this we have the distinct, affirmative testimony that the lights were properly lighted and set at 12 o'clock, and there is a presumption that such condition existed at the time of the collision; there being no testimony to the contrary. The court must consider the fact that the collision was attended with such force that it would be likely to put out the lights, that when the lanterns were found without lights the brig was listed over, her jib boom was under water, and she must have been substantially upon her beam ends, so that the testimony as to the absence of lights at this time is not very persuasive. The deck log of the Winooski shows that, from midnight to 4 a. m., it was kept by James Van Buskirk, the acting master, who is since deceased. The entry immediately after midnight is as follows:

"July 30. At sea. From midnight to 4 a. m. Cloudy weather and thick fog. Blew the whistle every five minutes. At 12:45 lookout reported a light right ahead. Saw it and immediately rung two bells; ordered the helm hard aport and rung three bells. Before anything more could be done we struck. Called away the first and second cutters which left the ship inside of five minutes and got all the persons from the wreck, which proved to be the brig Olive Francis, Captain Small of Machias, Me. Stayed by her during the watch. Took on board Captain F. A. Small, Mrs. Small, the two Misses Small, Mate George A. Hewitt, and Mrs. Hewitt, Second Mate Charles Wood, four men and steward. All saved."

It is evident, then, from the log, that at 12:45 the lookout reported a light upon the brig, and that the acting master, Van Buskirk, "saw it." The court must come to the conclusion that the testimony to which I have referred as to the lights being out is not persuasive as against the affirmative testimony that there were lights, and against the evidence of the log of the gunboat that the lookout reported a light, and that the acting master saw it. In my opinion, there is not sufficient testimony to convict the brig of fault in that she did not have her regulation lights set and properly burning at the time of the collision.

4. The government accuses the brig of fault in failing to have a sufficient lookout.

The second mate, Wood, was in charge of the deck during the watch when the collision occurred. He was standing in the waist of the brig. At this point he could observe both the lookout and the man at the

wheel, and could give his orders to both. He heard the steam whistle of the gunboat at 12:45 just before the vessels came together, but did not hear any whistle before that time. Whether or not he was in a proper location on the brig for the navigating officer it is unnecessary to inquire, for if he had been in a different place he could not have prevented the disaster. The seaman who was stationed at the lookout has not been found, and is not produced. There is affirmative testimony, however, that he was walking the forecastle deck when the first mate went below at midnight; that he was standing on the topgallant forecastle attending to his duty. The second mate testified that the lookout "was walking across the topgallant forecastle back and forth, across the forecastle, and from the forward house to the eyes of the topgallant forecastle, back and forth, across and back. That was his round. At the time of the whistle of the gunboat he had been walking back and forth, and when he would walk back and forth he would look, and I would do the same, out to leeward." The second mate says that he called the attention of the lookout to the whistle of the steamer at 12:45, and the lookout said he had not heard it. Under certain circumstances such a failure to hear the whistle might be a cause for condemning the brig; but, clearly, under the testimony, the brig should not be condemned for this fact alone. The staysail was between the lookout and the gunboat. The wind was blowing from the lookout to the gunboat. He had just been blowing his horn at the time the steamer's whistle blew. It is impossible to believe that, if he had heard it, the collision would have been averted, for the second mate heard it, and, if anything could have been done to avert the catastrophe, it was his duty to give such orders as were necessary. But the vessels came together so soon after the whistle was heard that it was too late to avert the peril. It is impossible to tell in seconds precisely how much time elapsed between the sounding of the gunboat's whistle and the collision. Estimates of time during moments of peril are unsatisfactory; but from the whole evidence I must come to the conclusion that there was not time after the hearing of the steamer's whistle to avert the collision, and that the failure of the lookout to hear the last whistle did not affect the result. The answer itself assumes that this time must have been very short, for it says that, when the steamer blew the last blast of her whistle, she was so near the port side of the brig that the second mate "did not have time to give any order to the wheelsman to change the course of said brig before the collision occurred."

It is true that the lookout had the further duty of blowing the horn; but that does not render him an improper lookout, as the courts have frequently held. The evidence shows that at 12:45 the whistle of the Winooski was heard by the second mate. Nothing further could have been done if the lookout forward had also heard it. There is testimony that the whistle of the steamer sounded oftener than every five minutes, but from the whole evidence I must come to the conclusion that the log states the matter correctly that the whistle blew every five minutes. At the rate of speed at which the steamer was proceeding I cannot find that there was fault upon the part of the lookout for not hearing a fog signal which was blown five minutes before the collision. The learned proctor for the petitioners has plotted upon a map the posi-

tion of the vessels five minutes before the collision, and it appears that, at the rate of speed at which the gunboat was going, she must have been at that time 3,860 feet from the brig. I have already quoted from the deck log of the gunboat. Neither that nor the steam log make any mention of the want of lookout on the brig, nor do they allege any lack of vigilance on the part of the brig when the collision occurred. On the question of moderate speed of the brig, I have already referred to the fact that there was an absence of any entry in the log of the gunboat as to the speed of the brig, and have commented upon the effect which, in law, such omission should have.

I find, then, that the brig was not in fault in that she failed to have a sufficient lookout.

5. The government seeks to have the brig condemned in that she did not sound fog signals.

Rule 15 of the rules of 1864 provides that:

"Sail vessels under weigh shall sound a fog horn at intervals of not more than five minutes."

Until the rules of 1885 the use of a fog horn sounded by the breath at proper intervals was a compliance with the regulations and usage of seamen. The Bolivia, 49 Fed. 170, 1 C. C. A. 221; The Pennsylvania, supra; The Hansa, supra.

The evidence shows that a mouth fog horn was used upon the Olive Francis, and that it was blown during the watch prior to the collision from 8 p. m. to midnight at intervals of at least one minute and a half. There is affirmative testimony that during the watch in which the collision occurred, from midnight to 12:45 in the morning, the horn was blown at intervals of one minute. When Mrs. Jewett, the wife of the mate, went below and turned in at 8 o'clock, the fog horn was blowing, as she testifies, and continued to be blown. She testifies that she did not sleep after her husband turned in shortly after midnight, and that during that time she heard the fog horn blowing, and was unable to sleep because of its sound. This evidence is uncontradicted. There is testimony that the fog horn was not heard upon the steamer, but the testimony is of an unsatisfactory character. Even if it were not heard upon the gunboat, that fact is of little consequence agains the affirmative testimony from the brig. The noise of the engines and paddle wheels of the gunboat and the water thrown up by her bows against a nearly head wind at the speed at which she was going, would account for the failure to hear the fog horn. The Niagara (D. C.) 77 Fed. 330; The Fulda (D. C.) 52 Fed. 400. As against the affirmative testimony on the part of the brig, the negative testimony of the steamer does not induce the belief in my mind that there was any fault upon the part of the brig in relation to the matter of the fog horn. Here, again, the logs of the gunboat are silent. They allege no failure on the part of the brig to sound her fog horn. The courts have frequently said that, in the absence of affirmative proof, the improbability that a sailing vessel would have been guilty of such a fault should be persuasive to the court. The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620; The John Fleming (D. C.)

149 Fed. 904; The Metamora, 144 Fed. 936, 75 C. C. A. 576; Troeder v. Lorsch, 150 Fed. 710, 80 C. C. A. 376.

6. The government urges that the brig was at fault after hearing the whistle of the gunboat in not giving some special signal to warn the gunboat, and in putting her helm hard astarboard.

At the time of the collision in 1866, there was no rule requiring special signals. The testimony seems to me clearly to show that after the vessels came in sight there was no time for a signal. It is true that the testimony is very unsatisfactory relating to the exact time in seconds which elapsed after the two vessels came in sight of each other and before they came together; but it seems clear to me that there was no time to light a torch or to make any adequate signal, and I cannot hold that the brig was at fault for not giving some special signal.

The contention that the helm of the brig was starboarded before the collision is based upon the fact that the helm was found at hard astarboard after the collision. I do not think this testimony alone should be sufficient to convict the brig of this fault. The force of the collision was great. The blow was given upon the port side of the brig and at substantially right angles. This blow would drive the brig sideways to starboard. The hull of the brig being thus driven to starboard, the resistance of the water against the rudder would have been likely to have carried the rudder to port. I am of the opinion that any change made after the whistle of the gunboat was heard was a change made in extremis, and after the brig was brought in imminent peril by the fault of the steamer. After a careful examination of the testimony, I find that nothing done by the brig could have avoided the collision or could have materially decreased the injury. The City of Paris, 9 Wall. 634, 19 L. Ed. 751; The Louisburg, supra; The Martello, 153 U. S. 64, 14 Sup. Ct. 723, 38 L. Ed. 637; The Chattahoochee, supra.

7. The government alleges that the collision was due to inevitable accident.

I have already found that the initial cause of the collision was the immoderate speed of the gunboat. It seems, then, unnecessary to find affirmatively with reference to the matter of inevitable accident. Upon this question the respondent has the burden of proving that the collision resulted from a cause which, in the exercise of ordinary prudence, human skill and foresight could not have prevented. Courts have invariably held that a steamer going at an immoderate speed in a fog on a dark night or thick weather cannot be heard to say that the collision was the result of inevitable accident. In view of my finding upon the first point discussed in this opinion, it is unnecessary to pursue further the subject of inevitable accident.

In conclusion, then, I find that the steamer's immoderate speed was the sole, direct, and immediate cause of the collision. I find, further, that the brig was without fault.

A decree may be entered for the petitioners. An assessor may be appointed to report the amount of the petitioners' damages.