## THE RABBONI.

## THE NELLIE E. RUMBALL.

### (Circuit Court, D. Maine. December 12, 1892.)

**1. COLLISION—LIGHTS AND LOOKOUTS.**
    In a collision case, where there is a dispute about lights and their bearings, the lack of a proper lookout or the absence of his testimony has a very great weight against the vessel deficient in this respect.

**2. SAME—BETWEEN SAILING VESSELS.**
    A schooner and a barkentine approaching each other at night nearly head on, or on close parallel courses, came into collision, the latter striking the former on the port bow. The schooner was sailing closehauled on the starboard tack, while the barkentine was going free on the port tack. The court found, on conflicting testimony, that the barkentine was to leeward of the schooner; that the schooner was allowed to fall off so as to contribute to the disaster; and that no sufficient explanation for so doing was given; and also that the barkentine, having plenty of sea room, and with knowledge of the schooner's approach, failed to keep away, as she might have done. *Held*, that both vessels were in fault, and the damages should be divided.

**3. SAME—EVIDENCE—APPEAL.**
    Where there is great conflict in the evidence as to the value of a vessel damaged by collision, the finding of the district court as to her value will not be reversed by the circuit court on appeal. The Parthian, 48 Fed. Rep. 564, followed.

**4. SAME—DAMAGES LIMITED TO VALUE OF VESSEL AND FREIGHT.**
    Damages for injuries to a vessel by collision should not exceed her value and her net pending freight, (to be computed by the rule given in the opinion,) where this will fully indemnify her owners. The class of cases where more is allowed should be strictly limited.

**5. SAME—INTEREST AS DAMAGES.**
    Where not more than the value of the vessel and her net pending freight is allowed as damages for collision, interest should be added to make complete restitution.

Appeals from the District Court of the United States for the District of Maine.

In Admiralty. Libel by Thomas J. Stewart and others, owners of the schooner Rabboni, against O. P. Rumball and others, owners of the barkentine Nellie E. Rumball, to recover damages for a collision: Cross libel by the latter against the former for the same collision. The district court found that the barkentine was alone in fault, and

decreed accordingly. 53 Fed. Rep. 948. Her owners appeal. Decree modified.

Eugene P. Carver, for the Rabboni.
Edward S. Dodge, for the Rumball.

PUTNAM, Circuit Judge. On these appeals the owners of the Nellie E. Rumball, the barkentine, have produced important testimony which the learned judge who heard the cases below did not have the benefit. of. On the other hand, the owners of the Rabboni, the schooner, have not yet produced their lookout. In the light of the new evidence, all the proofs as they appeared to the district court seem to require re-examination.

The day after the collision, Capt. Tapley, the master of the Rabboni, noted his protest, in which he stated the wind was N. W. by W., and his course was W. S. W.; and Capt. Johnson, the master of the Rumball, the same day stated in his protest that the wind was W. N. W., and his course N. E. by E. 1-2 E. In one part of his evidence Capt. Tapley makes his course southwest or southwesterly, and expressly states that it was by compass; and the libel in behalf of this vessel alleges that she was closehauled on the starboard tack, and heading southwest by compass. Therefore, on the statement of this master, he was able when he made his protest to give the general course of his own vessel and the direction of the wind with approximate accuracy. He attempts to persuade the court that the notary did not correctly take down his oral statement. But inasmuch as he testifies unqualifiedly that his vessel was closehauled, and that she could lie as snug as five points, and gave in his protest the wind five points off from her course as stated therein, the notary, if he misunderstood him, must have done so with reference to both facts, which is extremely improbable.

Moreover, Capt. Tapley's protest is in harmony on this point with the facts in other respects. I think it may be accepted that Capt. Tapley thought he could make the Handkerchief lightship well enough without another tack, and that the last tack he made was somewhat southerly—he says about a half a mile—from the Shovelful lightship, where there was sufficient water for a vessel of his schooner's draught; and, even without the clear admissions to that effect in his testimony and elsewhere, it is to be presumed his vessel would on this tack bear away directly for the Handkerchief. I am therefore satisfied that the Rabboni headed on her last tack somewhat more westerly than the chart course between the lightships, and that she bore generally somewhat across the course of the Rumball, although in very nearly the opposite direction. I have no reason to doubt that Capt. Johnson's protest gave the general course of his vessel correctly. The logs of the two lightships are rather general, but they are consistent with Capt. Tapley's holding a course fully as much to the westward as his protest states.

It does not appear important to investigate the claims as to the alleged improper position and deficient illuminating power of the Rabboni's lights, as it is clear that those claims, if sustained, would not help to solve the difficulties of these cases. The witnesses for the

Rabboni testify that the green light of the other vessel bore constantly, till just before the collision, over their starboard bow, and the witnesses for the Rumball testify that the red light of the Rabboni bore over their port bow. The cases turn mainly on this discrepancy. There is no proof that the Rumball did not seasonably see the Rabboni's lights, and on the case as made by the Rumball, and on the courses of the vessels as found by me, she could not have been misled by their overlapping each other, though she might have been on the case as made by the Rabboni. If the two vessels were constantly green to green, their courses could not thereafterwards intersect, and perhaps never had intersected, and the Rumball must have been to the windward; and, if not green to green, the Rabboni might or might not have crossed the intersection of the courses, if they did intersect, but the Rumball must have been to the leeward. On the latter hypothesis, inasmuch as the schooner was closehauled, and as a fresh northwesterly wind on this coast would hardly draw steadily from the same point of the compass, a slight fault or inattention at her wheel might have allowed her to have fallen off under the bow of the Rumball in such way as, in connection with the admitted change of the wheel of the latter when the collision was imminent, would have brought the vessels together quite in the direction in which they in fact collided. On the other hypothesis,—that is, with lights green to green,—although of course it would not have been impossible for the Rumball to swing so as to run upon the starboard bow of the schooner in the direction of the collision, yet, with the Rabboni holding her course, this could have occurred only through a change of that of the Rumball of quite eight points, improbable of itself, and quite incredible in the face of the full and careful manning of her deck, clearly shown by her witnesses. Capt. Tapley was very likely trying to meet the force of this proposition, by shifting his statement of his vessel's course from W. S. W. to S. W. This, if true, would have diminished the improbability, but not removed it. For this reason, and also because of the probable courses of the two vessels as already explained, and, further, because of the present preponderance of proofs in behalf of the Rumball, I conclude that she was at the leeward prior to the collision.

The Hercules, 17 Fed. Rep. 606, relied on by the Rabboni, does not apply, because what is there stated to be improbable did in fact occur in the cases at bar; and the question is not the improbability of the occurrence, but only the balance of improbabilities as between the two vessels. Neither am I aided by the rule relied on in behalf of the Rabboni, touching the special weight to be given to testimony of persons aboard a particular vessel as to her own movements, as this rule is neutralized in the cases at bar. I am satisfied there were no other lights in the vicinity which could have been mistaken for those of either vessel concerned in this litigation.

Capt. Tapley's discrepancies in stating the course of his vessel and direction of the wind, especially in view of his positiveness in referring them to compass observations made by himself, have considerable weight in determining the balance of evidence in such close cases as these at bar, although the learned judge who saw and heard him

testify commented favorably on his general appearance. Peterson, the only other witness in behalf of the Rabboni, is apparently honest throughout. His positiveness in maintaining that the wheel of the Rabboni had not been changed, although it is not to be accepted, does not bear against him, as it is not uncommon for honest witnesses to give conclusions instead of actual observations. At the critical moment he was away from the wheel, having first "walked down to the lee side," and then "come up to the weather bow,—weather side." Peterson testifies that he saw the Rumball's green light a half point on the weather bow of the Rabboni. Capt. Tapley makes it a point and a half to two points and a half. It is possible that, when the Rumball was first sighted, Peterson might have seen the green light, inasmuch as the vessels were nearly head on, and the schooner was crossing the course of the barkentine. From his position "aft on the starboard quarter," he might easily have miscalculated the bearing of the light more than the "half a point" which he testifies to, and it is possible that at times the Rabboni yawed enough to bring the Rumball temporarily on the weather bow. There seems no impossibility in reconciling Peterson's testimony with the real facts in the case; but, if there was, it is clearly overborne by the great weight of the evidence for the Rumball.

It is either the misfortune or the fault of the Rabboni that her lookout is not produced as a witness. It is questionable whether he reported the Rumball at all, but it is certain that he did not report the change in her lights which the Rabboni claims occurred. It is strange that neither the testimony of Capt. Tapley nor that of Peterson takes any account whatever of him at the time of collision. This lookout had been on duty forward nearly four hours, and was only 21 years of age; and it is not a violent presumption that he was drowsy during all these occurrences, if not asleep. It may be that he failed to report change in the Rumball's lights because there was no change. He was discharged by the Rabboni soon after the collision, when he had no right to such discharge. While it is undoubtedly true that the want of a lookout, or of his evidence, cannot affect the conclusions of the court when it is clear the collision did not arise from his neglect, yet, when this fact is not clear, or when, as in the cases at bar, there is a dispute about lights and their bearings, the lack of a proper lookout, or of his testimony, has very great weight against the vessel deficient in this respect. It is needless to refer to authorities touching this well-known elementary proposition.

Two witnesses have been produced by the Rumball on this appeal who did not testify in the district court,—one, the man at the wheel, and the other, the lookout. Their evidence was taken under circumstances which largely overcome the presumptions against the testimony of several of a crew given en masse while they remain a crew. They had been discharged long before. One was living in Sweden and the other at Chicago; and the testimony of the former was taken on interrogatories and a commission, and of the latter orally, and each under such circumstances that there was no apparent opportunity of collusion between them. Their evidence appears fair. That of the man at the wheel is not so distinct on certain points as that of the

lookout, and vice versa, and there are some discrepancies; but each refutes positively the claim of the Rabboni as to the relative positions of the vessels. The cases are very difficult; but on the whole I hold that the Rumball was to the leeward, and if the schooner had firmly kept her course the collision would probably have been avoided. There is no claim that she made any change in the extremity of danger. Indeed, it is strenuously denied that she eased off even in that emergency. And therefore, as she does not explain or excuse her falling off, but denies it, she must be held in fault.

It appears that this thoroughfare is sometimes crowded. But this night no other vessels were in range. There were ample water and sea room, and weather suited for easy and safe navigation. It is improbable that the schooner fell off very considerably. The man at the Rumball's wheel states that she steered "rather hard;" the wind was fresh and puffy. And Capt. Johnson admits that the Rabboni might have been making some lee way, perhaps the equivalent of a point; that the tide might have taken her on the weather bow, and set her off a little; and that this perhaps was what made him think she was coming down on him. Under these circumstances he chose to run under her lee on courses which, if calculated correctly and held by both vessels, would have given, in his opinion, a clear way of four or five lengths. But this opinion embraced several elements liable to uncertainties; and I am not satisfied that he made the margin which he could have made, easily and properly, for errors in his calculations, or for the contingencies which might disturb them. He apparently felt this when, in his evidence, he replied that he "don't calculate to run a vessel ashore for the sake of giving a man a four or five miles berth." His statement that the Rabboni's light kept at substantially the same point on his port bow, "if anything, settling down on him somewhat," proves that he was advised that the vessels were nearly head on, or were drifting together. Indeed, he testified that, when he first saw her hull, she was just about on an opposite course, and only about half or three quarters of a point on his weather bow. He also testified that after this she seemed or began to "drop down" on him; that he then told the man at his wheel "to keep off a little, so as to give her a little more room;" that he "walked aft and saw the man heave the wheel up;" and that "he put it pretty well up, because I told him to keep her off." But his order was only to "keep her off a little." Why, then, was the wheel put "pretty well up?" He continued: "I walked aft and saw the man heave the wheel up, and when I turned round again she had swung right off across my bow;" and in reply to the court he emphasized this. This agrees with his protest, which states that when the schooner "changed her course, and was heading to cross our bow," the vessels were "within a few lengths of each other;" and all this confirms the theory that Capt. Johnson was out of reason in the statement of his opinion that, had the schooner kept her course, there would have been a clear way of four or five lengths. However, I am not now referring to his testimony as bearing on this particular point, but to compare it with his protest of October 23,

1888. This says that when he saw the Rabboni's light, "about one mile," he "kept off about half a point;" that "as she neared," "to give her as wide a berth as possible," he "ordered the helm hard aport;" that, when this order was given, her "red light was still in full view;" that, "immediately after," he saw she was "heading to cross our bow;" and that "the vessels were then within a few lengths of each other." It is, indeed, difficult to reconcile his testimony with his protest. As the latter was made so soon after the collision, it must stand as against his evidence; and it impresses the court strongly that the order "hard aport" was given because Capt. Johnson found unexpectedly that he was close aboard the schooner.

In this connection I find much support in the conclusions of The Laura V. Rose, 28 Fed. Rep. 104, and of The City of St. Augustine, 52 Fed. Rep. 237. I regard this as one of that class of collisions which ordinarily would not happen, if either vessel used the great care incumbent on those navigating the crowded coasts of New England, in behalf not only of property, but of human life. While it is not necessary to say that there is any strict analogy between the rules of negligence governing inland carriage and those governing water-borne commerce, yet human life is worth the same on the ocean as within the body of the county; and the underlying principles of the duty incumbent on all whose errors may imperil it, and of public policy, are the same everywhere, so far as they require the utmost vigilance and the extremest precautions in behalf of safety. There are times of peril, and indeed times when there is no immediate peril, when we must accept as conclusive the exercise by a master of a vessel of his best judgment as formed on the spot, though the result may show it erroneous and fatal, and also when close hazards must be run. But this instance bears no such character. Under the circumstances of these cases, the master had full chance to form correct determinations, or to make ample margin for errors; and he fell far short of the positive duty resting on him, as sailing free, to keep clear of the schooner, and to show that he did this. Therefore I must condemn each vessel to pay half of the damages, and of the costs in each court.

As to the value of the Rabboni, the state of the proofs brings these cases with great aptness within The Parthian, 48 Fed. Rep. 564. I accept as to this the finding of the learned judge of the district court, fixing it at $3,600, and for the same reason his determination as to the proper cost of repairs. I think it safer to limit strictly the class of cases in which more is allowed than the value of the vessel and her net pending freight, if lost. The Venus, 17 Fed. Rep. 925, 927; The Glaucus, 1 Low, 366, 372; The Cambridge, 2 Low, 21, 26. The owners of the Rabboni will be fully indemnified by these allowances, especially as they retain the salvage. When not more than the value of the vessel and pending freight is given, interest should justly be added, to make complete restitution. Therefore, in computing the damages, the commissioner will take, as those suffered by the Rabboni, the value of the vessel, $3,600, and the net pending freight, with interest, both to be computed by the rule given in Marsden on Colli-

sions, (3d Ed. pp. 111, 112.) I give him no special directions for estimating the damages suffered by the Rumball, except to make corresponding allowance of interest.

Decree of the district court modified; both vessels at fault; each to pay one half of all damages, and of the costs in each court; and William M. Bradley is appointed commissioner to assess the damages on the principles of this opinion.