## THE METAMORA.

### WINSOR v. AYER.

(Circuit Court of Appeals, First Circuit. February 21, 1906.)

#### No. 608.

1. COLLISION—SUIT FOR DAMAGES—PLEADING.
　　Technical inaccuracies in the statement of facts in a libel in admiralty for collision are not ordinarily regarded, where they do not effect the rights of the parties.

**2. SAME—SAILING VESSELS MEETING—MUTUAL FAULT.**

Two schooners both *held* in fault for a collision when meeting at night in the open ocean; The one, which was light and sailing free, for not making sufficient allowance for the yawing of the other which was close hauled in a strong wind and heavy sea, and the other for probably allowing herself to fall off owing to the fact that her master was performing the duties of both wheelsman and lookout.

Appeal from the District Court of the United States for the District of Massachusetts.

Edward S. Dodge (Benner & Foster, on the brief), for appellant.
Edward E. Blodgett, for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This is a case of collision off the coast of New Hampshire or Massachusetts, between the deeply-laden lumber schooner John T. Williams and the fishing schooner Metamora running light, in which the Williams was sunk. The District Court held that the Metamora was alone in fault, and decreed the entire damages against her. The collision, as found by the learned district judge, occurred about quarter past 6 o'clock on a December evening, when the night was clear, the moon three days old, setting at quarter past 7, with the wind strong to the northwest, and on the open ocean. Under the circumstances, it should not have happened, so much so that we necessarily conclude there was fault somewhere. The Metamora seeks to discredit the case of the Williams because the libel alleges that she was on a course somewhat different from that found by the District Court. Admiralty is not sufficiently technical to attach importance, except under some peremptory circumstances, to such discrepancies in collision cases, where the facts are often not correctly ascertained by the parties themselves until developed by the taking of proofs. It is sufficient here that the material circumstances of the case do not depend on this discrepancy.

The Williams was sailing close-hauled on the starboard tack, so that the somewhat heavy sea caught her under the starboard bow, and increased her tendency to yaw and drift to port which the admiralty courts have frequently recognized. The Metamora was sailing free on the port tack, and had little tendency, therefore, to drift or yaw. When the vessels first sighted each other they were port to port, red to red. The crew of the Williams on deck were engaged in pumping, and the only proper deck watch was the master, who was at the wheel. The mate had been directed by the master to go forward occasionally and look for lights. He was aft during a portion of the incidents immediately preceding the collision, so the Williams had no proper lookout. This was peculiarly illustrated by the fact that the mate mistook the Metamora for a steamer until he was corrected by his captain, which, of course, was a sheer blunder. In order to observe the Metamora, the captain of the Williams, while attending the wheel, was compelled to look over the deckload and under his boom, which, of course, swung out on the port side. He testified

that he stood on the port side of the wheel, that is, to the leeward, when he first saw the Metamora; that afterwards he looked at her with the glass; that he held on with one hand, and stepped out to one side to look; that he hung on to the wheel with one hand, so that the wheel would be stationary; that at one time he lost sight of the lights because they were hidden by his jibs; that he stepped across to the starboard side to see them; and that at all times, as we have said, he hung to the wheel, and did not leave the wheel alone. In other words, he was doing triple duty. He was the officer of the deck, and he was both wheelsman and lookout, with no assistance whatever at the wheel.

On the other hand, the Metamora had a man on the lookout and a man at the wheel. The testimony of each of them is straightforward, as well as consistent with that of the other, and the conduct of each was seamanlike, except in the single matter which we will state hereafter. Like most fishermen, the Metamora had only one officer, who was the captain. He was in command of the deck, but went below for his supper a few moments before 6 o'clock. He was below about a half hour, and then heard the call from his lookout, "hard down," as we will hereafter explain. When he heard the "hard down," he jumped to the deck, and saw the Williams going by on his starboard hand.

The two vessels were approaching each other at the rate of at least 18 miles an hour, or nearly a mile in three minutes. The lookout on the Metamora was called on his watch at 6 o'clock, and was on the lookout, certainly, within five minutes thereafter. This was about ten minutes before the collision, when the vessels must have been between two and three miles apart. He testified that he at once saw the red light of the Williams, which he said was probably a point on his port bow. The captain of the Williams testified that, when he first sighted the Metamora, she was very near two miles away, and her red light was a little less than a point on his port bow. Consequently, the lookout of the Metamora and the captain of the Williams must each have descried the light of the other vessel about the same instant. Notwithstanding the suggestion of the Williams to the contrary, the case shows sufficient vigilance in this respect on the part of the Metamora; but, in view of the fact that both vessels were on the open ocean, where there was ample room, in view also of the fact that the Williams was close-hauled, with a strong wind and a heavy sea on her starboard bow, tending to throw her bow over and cause her to drift, in view also of the further fact that the Metamora was sailing free, and therefore not subject to drift, the courses on which the vessels were then sailing were too close to each other to make sufficient allowance for the yawing and drifting of the Williams, and for slight errors or accidents of any kind which might cause her to fall off. Also, the necessity which the Williams might have, from time to time, to fall off for filling her sails, as recognized in The Elizabeth Jones, 112 U. S. 514, 524, 5 Sup. Ct. 468, 28 L. Ed. 812, and in Marsden's Collisions (5th Ed. 1904) 386, 410, should have been allowed for by the Metamora; but she did not do so sufficiently.

The lookout of the Metamora watched the red light of the Williams, as he says, "for a minute or two, probably two minutes." Of course, such estimates of time can never be taken too accurately, as experience shows; but he did certainly watch the Williams's light for some time, and meanwhile its bearing on his port bow did not change. It continued, as he said, about the same, showing that the courses of the two vessels must have been approaching each other in some degree, otherwise the red light of the Williams would have opened up over the port bow of the Metamora. After this "minute or two" the lookout of the Metamora called out to keep her off. He testified that she kept off "a little bit," "about a point"; and that he thought she would go clear all right, and that the vessels would pass each other about 200 yards apart. Nevertheless, he was, under the circumstances, in fault for not giving the order to keep off sooner, leaving the Williams a larger margin. He said he then watched her for "two minutes probably," when he saw her green light probably "one-eighth of a mile away," but her red light was shut out. Then he called out "hard down," and the Metamora came up into the wind, he does not know how much, and then came the collision. We observe that almost simultaneously the captain of the Williams put his wheel hard astarboard. These orders for each vessel were apparently all that could then be done, as they might ease the blow of the collision, even if they did not prevent it. Witnesses from each vessel testified that this maneuver on the part of their own vessel was correct in this respect; and we think we can justly accept the testimony.

On the other hand, the captain of the Williams testified that he first saw the red light of the Metamora under his lee, that is his port bow, nearly two miles away, as we have said; that then he took his glass to look at her, holding on to his wheel, also as we have said; that, when he looked at her with the glass, he saw both lights, red and green; that he could see her plainly; that the mate came to him, took the glass and looked at the Metamora, and then went forward to see about the Williams's lights; that he made no change in his course; and that he (the captain) kept watch of the Metamora until he could not see either light. He admits that the jibs and sails hid her then, so that he could not see her from where he was. He testified that he next stepped to the starboard side of his wheel, and saw the Metamora's red light on his starboard bow, and knew there must be a collision; that he then hove his wheel hard astarboard; and that his vessel might have gone off a quarter of a point.

The lookout of the Metamora testified that she struck the Williams on her starboard bow, a glancing blow around the forerigging, but that it was not head-on. The captain of the Williams testified that, at the time of the collision, he saw the red light of the Metamora, as we have said, but that his jibs hid her green light. He also testified that, as near as he could tell, the Metamora struck "close to the forward rigging," and he added: "The forward rigging went first, then she came along and took the main rigging, and then took the boat." He also testified that, so far as he could tell, "her bowsprit came inside of the main rigging." The mate, who was forward at

the precise time of the collision, testified as follows: "Then I looked round, and saw the fishing smack's bowsprit come right straight at us on our starboard side." These descriptions, of the Metamora's lights and of their bearings, as the captain of the Williams saw them, and of the manner of the collision as explained by him and his mate, harmonize, as is easily seen, with a theory that the Williams did not hold her course with her nose to the wind, but fell off. This, of course, would require that she should fall off more than a point, but it would not require that she should fall off more than might very well happen under the circumstances under which her captain was acting both as steersman and lookout, using the glass, and passing from port to starboard of his vessel. The fact that he sighted at a considerable distance both lights of the Metamora would indicate that the Metamora was not holding her course strictly, but was coming up a little into the wind; that is, yawing to some extent. A very slight yawing might show both her lights when distant, although both might show if they crossed each other a single point, as is sometimes the case. Nevertheless, as we have said, all the changes of lights and bearings as told by the captain of the Williams would naturally lead to the theory that his vessel had fallen off.

On the other hand, as the Metamora showed her red light to the Williams at the time of the collision, and as her bowsprit came inside of the main rigging, and swept away first the forward rigging and then the main rigging, and as she came so well up on the starboard of the Williams as to induce the latter's mate to testify that her bowsprit came right straight at the Williams on her starboard side, even though this had been somewhat exaggerated, it follows that, if the Williams did not fall off, the Metamora crossed under her bow and then swung to starboard some four points or more. If she showed the Williams her red light only, she must have swung more. This theory, in either view, is so improbable that it is difficult to accept it. For the reasons we have stated, any mere inattention at the wheel of the Williams might well have accounted for the collision; and this inattention, in view of the multiplicity of duties of her captain, as we have explained them, might well have occurred notwithstanding his impressions to the contrary. Also, in view of the fact that the Metamora was sailing free, with the wind and sea pressing her port quarter, any mere inattention at her wheel would not have brought about the collision as it occurred, but one between her starboard side and the bow of the Williams. That the Metamora swung so many points would have been extremely improbable, even if she did not see the lights of the Williams, and all the more so if she did see them as testified to by her lookout. This improbability has been recognized by this court in The Rabboni (C. C.) 53 Fed. 952, 954; Id., 81 Fed. 239, 240, 26 C. C. A. 379, and in The Nottingham, 143 Fed. 942, in which an opinion was passed down on January 26, 1906. Therefore, the probabilities are altogether against the Williams, so far as her theory as presented to us seeks to relieve her from all fault on her part.

In addition to the above, we must recognize, not particularly as rules of law, but as practical rules, what we stated in The Charles L. Jeffrey, 55 Fed. 685, 686, 687, 5 C. C. A. 246, and in The City of Augusta, 80 Fed. 297, 299, 25 C. C. A. 430, and in other cases. According thereto, the Williams is bound to maintain her claim in charging the Metamora with the entire fault of the collision, as alleged by her, by a preponderance of the case. This, of course, includes weighing the probabilities. Also, she is bound by the rules which we there stated with reference to the presumptions against a vessel on which discipline is slack, or which, "either through the necessities of economy or for other reasons," is "not able to show such constant vigilance, especially on the part of the lookout, as is necessary to sustain the burden" resting on her. We there observed that the inability of such a vessel to maintain her demand "must be laid to her own misfortune or negligence, and not to the courts or the law." We would not be justified in applying these rules to the Williams on the ground of mere lack of discipline, because, so far as the record is brought to our attention, we are not entitled to assume that the want of a lookout was due to any cause except the necessity of sending the whole crew to the pumps and keeping them there. Nevertheless, the rules cited apply, not only to negligence, but to misfortune. Therefore, in any view, they so far reach this case as to bring the Williams within the class of vessels referred to, which are unable to support their demands by a fair preponderance, because we are compelled to weigh, as against the clear evidence of a lookout and a man at the wheel, the testimony of each of whom is fair on its face, the unsupported testimony of the captain of the Williams, acting in the various capacities which we have described. On the ordinary rules of weighing evidence, the preponderance is not with the Williams, but against her; and there is nothing peculiar in this record which would justify us in refusing to apply them here.

On the whole, it is clear that the collision in question before us could not have occurred unless one or both vessels were in fault. The Metamora was in fault for hugging the Williams so close when she had the open sea in which to maneuver, but this fault alone could not have brought on the collision in the way in which the Williams maintains it happened. It is difficult to see how it could have occurred without negligent co-operation of the Williams. As we have shown, the theory presented by the Williams seems to us very improbable, and there are no proofs in the record sufficient to demand of us in her behalf that we should refuse to recognize that improbability. In our judgment, both vessels were more or less in fault, and neither of them can be excused.

The decree of the District Court is reversed; the case is remanded to that court, with directions to apportion to each party one-half of the damages and of the interest thereon, and one-half of the costs in the District Court; and the appellant recovers his costs of appeal.