**McALLISTER BROS., Inc., v. THE JAMES J. MURRAY et al.**

**WALDIE v. THE JAMES McALLISTER et al.**

**THE McALLISTER NO. 79.**

**THE JAMES J. MURRAY.**

**THE JAMES McALLISTER.**

**THE MARY E. WALDIE.**

Nos. 16248, 16387.

District Court, E. D. New York.

Dec. 5, 1941.

Dow, McAllister & Symmers, of New York City, for respondent the James McAllister.

Hagen & Eidenbach, of New York City (Charles W. Hagen and Nelson J. Johnson, both of New York City, of counsel), for the James J. Murray.

Macklin, Brown, Lenahan & Speer, of New York City (John F. Quarto, of New York City, of counsel), for Susana Waldie.

GALSTON, District Judge.

By stipulation at the trial it was agreed that the libellants Waldie and McAllister Bros. Inc., are entitled to decrees against either or both respondents.

On the night of March 4, 1941 the tug James McAllister took in tow four light scows at Raritan, New Jersey, and proceeded on its way on a course between Staten Island and Shooters Island, about in the middle of the channel, favoring its starboard side. The James J. Murray, a small diesel tug, having in tow a steel dump barge, was approaching from the opposite direction. The Murray had picked up the light scow at the south side of Shooters Island, abreast of the ferry rack. It is the claim of the McAllister that as she was proceeding thus in the middle of the channel, favoring the starboard side, on seeing the two white lights of the other tow in the vicinity south of the ferry rack on the southerly side of Shooters Island, she slowed down, blew an alarm and finally pulled over as closely as she could to the United Dry Dock piers on the Staten Island side. One of the faults alleged is that the Murray was too small a tug adequately to handle the 225 foot steel dump scow as made up, particularly in the weather conditions prevailing.

Rossiter, captain of the tug James McAllister, said that they had left Raritan at 11:30 P. M. with the tow of four barges on a bridle hawser of about one hundred and fifty feet in length. Three of the barges were on the port hawser, the remaining one on the starboard hawser. The wind was blowing fresh northwest, the night clear and dark, and all his lights were up. The McAllister is a tug of 900 horsepower. Rossiter said that as he passed the green flash light near Shooters Island he sounded a cus-

tomary long blast signal to show that they were coming to the bend in the channel. At that time they were proceeding full speed ahead, which meant about four knots per hour through the water. The tide was in the second hour of the ebb which favored him to the extent of about half a knot. He was then in mid-channel, with his tow tailing straight behind. Not having received an answer to the bend whistle he proceeded on his course until he noticed two staff lights which appeared to him to be towing lights, in a vertical line; he could see no running lights. Rossiter then blew a one blast signal to signify that he wanted a port to port passing. Again he received no response and then slowed his engines to one bell and blew an alarm whistle and got no response. This was followed by the repetition of the alarm whistle, after which he noticed that the approaching vessel opened up a port light. Thereupon he rang for extra slow speed and changed his course very little to the right, i.e. towards the Staten Island shore. At that time the other tow was heading directly for his vessel. He was then off the pier of the Bethlehem Steel Company, approximately seventy-five feet. The wind was twenty-five to thirty miles an hour and had the effect of setting him closer to the shipyards. The port to port passing was not effected and a collision followed. The port side of the Murray tow, the mud scow #62, hit the McAllister No. 79, which was the second boat on the port tier in tow of the James McAllister. The force of the contact caused a line on the James Murray to part, and that tug swung underneath the bow of the Cathode, causing contact between the Cathode and the James J. Murray and causing all lines on the starboard side of the McAllister tow to part. It is important to note that the sides of the scow No. 62 were fourteen or fifteen feet in height, her length about two hundred and twenty-five feet, with a beam of about fourteen feet; whereas the Murray is about sixty-five feet long with but two hundred and sixty horse power. The Murray drew about seven feet. Rossiter saw no lookout on the mud scow, nor did he see anyone on the tug.

The deckhand on the McAllister substantially corroborated his captain. When the Murray tug was first observed it was about fifteen hundred feet away and was nearer the Staten Island side of the channel, while the McAllister was in the middle of the channel.

Daisey, testifying as an expert, was of opinion that in the prevailing wind there was fault, with a tug of such limited power, in taking the mud-scow from the Shooters Island dock. But had he been required to do so, proper practice would have been to place the scow on a stern line, for Shooters Island is low and the wind sweeps over it.

The Murray version would place the McAllister tow on the wrong side of the channel and ascribes faulty maneuver by the captain of the McAllister in permitting the slackening of the towing lines and thus throwing the Cathode, the head barge, in the path of the tug Murray. The explanation offered is that such contact, though light, was sufficient to cause the #62 to bring up against the McAllister No. 79.

The Murray witnesses were not convincing. Apparently neither Conte, the deckhand of the Murray, nor Hiller, the scowman, acted as lookout. After leaving Shooters Island they were both stationed on the stern of the No. 62. They differed in estimating the distance between the two tows when the McAllister was first observed by them, Conte suggesting between three hundred and four hundred feet, and Hiller seven hundred feet. Before the local inspectors Conte had estimated the distance as about two hundred or two hundred and fifty feet.

█ A consideration of all the evidence in the case leads to the conclusion that the Murray was on the wrong side of the channel, or at best, if in the middle of the channel, in the weather conditions prevailing, it was a matter of hazard for a boat of her relatively small power to proceed, strapped as she was on the port side of the large, light mudscow, and overlapping its stern by from ten to twelve feet. It is most unlikely that the Murray was within twenty-five to fifty feet of the Shooters Island shore, as the scowman and deckhand of the Murray contended. A wind blowing out of the northwest and north at from twenty-five to thirty miles an hour tended to set both tows towards the Staten Island shore.

█ Whether the failure to station a lookout contributed to the accident is a point that must remain somewhat in doubt, but certainly the fault was not excused by the Murray, for a man at the wheel is not a sufficient or proper lookout, The Metamora, 1 Cir., 144 F. 936; The Wilbert L. Smith, D.C., 217 F. 981. However, the probability is that had the Murray stopped her engines when the tows were fifteen hundred feet apart, or made an effective effort to starboard its rudder, the port to port pass-

64

ing could have been accomplished without collision.

Finally it must be observed that the Mc-Allister was the burdened vessel in towing four scows on a hawser with a slight ebb tide under foot, and with the wind on its port side and port quarter. In such circumstances it certainly would not have been good seamanship for the captain to have reversed his engines. It is true that in stopping his engines the strain on the hawsers was lessened, but any tendency of her tow to swing to port because of such slackened lines would have been counteracted by the effect of the wind.

In the circumstances related it is not of moment whether the first contact was between the Murray and the Cathode, for that could have been but very slight indeed, since no damage is reported as to either the Cathode or the tug Murray. On the other hand the contact between the scow #62 and the McAllister No. 79 was apparently quite severe—severe enough to account for the proximity, after the collision, of the scow No. 62 in the vicinity of the Shooters Island shore.

It is urged by the Murray that Wohlfeld, one of the deckhands of the McAllister, admitted that when he first saw the red light opening up on the Murray, the tows were not head on but that the Murray was somewhat, though not very much, to his port; whereas Captain Rossiter said that when the red light opened up it bore dead ahead. But there was not any great difference in testimony between the two as to this point, for both agree that the wind was setting the McAllister and tow towards the Staten Island shore, so that it was not necessary for the McAllister to change her course. The weight of the evidence is that the collision took place on the Staten Island side of the channel, when the starboard side of the tow was not more than one hundred feet off the Staten Island shore. It would also seem that the McAllister barges were in line with the stern of the McAllister tug at the time of the collision.

All the probabilities in the case lend support to the McAllister version of the happening of the accident and discountenance the explanation given by the Murray, The Ganoga, 2 Cir., 257 F. 720. See also The Bellhaven, 2 Cir., 72 F.2d 206.

In the circumstances the libellants may have decrees against the tug James J. Murray. Submit findings of fact and conclusions of law in conformity with the foregoing opinion.